IN THE SUPREME COURT OF NORTH CAROLINA

No. 86A12

FILED 10 April 2015

STATE OF NORTH CAROLINA

v.

DANNY ROBBIE HEMBREE, JR.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Beverly T. Beal on 18 November 2011 in Superior Court, Gaston County, upon a jury verdict finding defendant guilty of first-degree murder. On 25 April 2013, while defendant's direct appeal was still pending, defendant filed a motion for appropriate relief with this Court pursuant to N.C.G.S. § 15A-1418. Heard in the Supreme Court on 14 October 2013.

> *Roy Cooper, Attorney General, by Robert C. Montgomery, Special Deputy Attorney General, and Derrick C. Mertz, Assistant Attorney General, for the State.*

> *Marilyn G. Ozer and William F.W. Massengale for defendant-appellant.*

HUDSON, Justice.

Defendant Danny Robbie Hembree, Jr. was indicted on 14 December 2009 for the first-degree murders of Heather Marie Catterton, Randi Dean Saldana, and Deborah Denise Ratchford. The trial court denied the State's motion to join the Catterton and Saldana trials and defendant was first tried capitally for the Catterton

murder, which is the matter at issue in this appeal. On 8 November 2011, the jury found defendant guilty of first-degree murder. After a capital sentencing proceeding, the same jury found two aggravating circumstances, both statutory. The first was that defendant had previously been convicted of violent felonies; the second was that Catterton's death occurred during a "course of conduct" involving violence to others. Despite finding fourteen mitigating circumstances, the jury recommended, and the trial court entered, a sentence of death. Defendant now appeals his conviction and sentence to this Court as a matter of right.

Defendant contends that the cumulative effect of several errors in the proceedings below denied him a fair trial. We agree. "Although none of the trial court's errors, when considered in isolation, were necessarily sufficiently prejudicial to require a new trial, the cumulative effect of the errors created sufficient prejudice to deny defendant a fair trial." *State v. Canady*, 355 N.C. 242, 246, 559 S.E.2d 762, 764 (2002). Accordingly, we vacate the conviction and sentence and remand for a new trial.

## FACTUAL BACKGROUND

Defendant spent the latter half of 17 October 2009 drinking alcohol and buying and smoking crack cocaine with Heather Catterton, Catterton's friend Sommer Heffner, and Heffner's boyfriend Michael Moore. At the time of her death, Heather Catterton was seventeen years old. Defendant was dating Heather's older sister, Nicole. Both Heather and Nicole had sex with men in order to obtain drugs.

In the late afternoon, defendant picked up Heffner and Moore outside a shop on Route 321 in Gastonia, North Carolina. After stopping at defendant's mother's house for approximately half an hour, the three continued to the house where Catterton lived with her father.

Eventually, the four left Catterton's house and drove in defendant's car to a store on Route 321. For the first of several times that evening, a dealer walked up to defendant's car and sold defendant crack cocaine through the opened car window. After the initial purchase was made, the group went to the trailer home of one of defendant's friends, where they all smoked defendant's cocaine. Over the next several hours, the four went from place to place purchasing and using more crack cocaine, drinking alcohol, having sex, and searching for money for more drugs and alcohol.

Eventually, with defendant driving, the others left Moore, who was still heavily intoxicated, at a convenience store. The remaining three in the car—defendant, Catterton, and Heffner—then drove to a local neighborhood where defendant purchased yet more crack cocaine. Defendant dropped Heffner off at Moore's mother's house at approximately 1:00 a.m. on 18 October. Catterton stayed with defendant and was not seen alive again.

Catterton's body was found in a culvert in York County, South Carolina several days later on 29 October 2009, dressed in a sweatshirt and socks, but otherwise nude. The remainder of her clothing and a crack pipe were recovered nearby two days later.

Approximately two weeks later, on 15 November 2009, a second body was discovered on a dirt road in York County. Two women were riding horses near King's Mountain National Military Park when one of them saw a "burn spot" on the side of the road. As they investigated, one woman saw what she first believed was a mannequin, but soon found was a body. Her friend called the police, who later confirmed via DNA testing that this was the burned body of Randi Dean Saldana.

## DEFENDANT'S CONFESSIONS

Late on 4 December 2009, defendant was arrested in Gaston County for a series of armed robberies. Over the next several hours on 5 December, defendant was interviewed by officers from both North and South Carolina. At least twice, defendant was given *Miranda* warnings and then stated that he was willing to answer questions from police. He confirmed repeatedly that he was not under the influence of drugs or alcohol. While at the police station, defendant was given food, soda, and coffee, and was allowed to rest. These interviews were recorded electronically, transcribed, and later presented to the jury in redacted form. Defendant also signed a written confession, reviewed that confession with police, and directed police where to make changes in the text. During these interviews, defendant confessed to several crimes, including the murders of Heather Catterton, Randi Saldana, and Deborah Ratchford.

Among other accounts, defendant told police that he killed Heather Catterton in his mother's laundry room at approximately 4:30 in the morning on 18 October

2009.  According to these statements, after Heffner was gone, defendant told Catterton that "her lighter was out," but that he had more lighters in a cabinet in the basement, and if "she'd come down there . . . we'd smoke some dope."  He then followed her, used "some kind of cord" to strangle her from behind, and pulled her to the floor. Next he covered her mouth and nose with his hands "for like 10 or 15 minutes," then put a plastic Walmart bag over her face, and finally stood on her throat with his bare feet.  Defendant told police that when these actions still failed to kill her, he punched her in the chest and her heart stopped beating.

Defendant stated that he then stored Catterton's body in a closet for several hours, until he disposed of it at approximately 6:00 p.m. that day.  At that point, he wrapped the body in a blanket, drove it across the border to South Carolina, and dumped it near a creek along Robinson Yelton Road.  Defendant said he later disposed of the blanket by throwing it in a dumpster and discarded the clothing by throwing it away near a creek.  Defendant gave conflicting statements regarding his motive for the killing.  At one point, he told police that he killed Heather Catterton for virtually no reason, but because he "[j]ust wanted to."  At other times, he told them he killed her to help her escape a hard life that involved prostitution, beatings, and drugs.

During these same interviews, defendant also confessed to four other murders, two of which he said occurred in Florida.  As for the other two homicides, defendant told police that he killed Randi Saldana several weeks after killing Catterton.  In

addition, defendant confessed to the August 1992 murder of Deborah Ratchford. Evidence about the Ratchford murder was not admitted at the Catterton trial.

Regarding the two women defendant claimed he killed in Florida, defendant refused throughout the interviews to provide details, but eventually did provide some information. Defendant told police that both women were white prostitutes, that he did not recall their names, and that their bodies were buried on Merritt Island in Brevard County. However, his statements about these murders conflicted regarding other important details. At one point, he told police that he committed the murders in 1992; at another, he said he killed them in 2009.

Four days later, on 9 December 2009, defendant recanted his confessions to the Ratchford murder and the two Florida murders. At trial, defendant also denied intentionally killing Catterton and Saldana.

## PROCEDURAL HISTORY

### Pretrial Proceedings

Defendant was indicted on 14 December 2009 for the murders of Heather Catterton, Randi Saldana, and Deborah Ratchford; he entered pleas of not guilty. The State moved to join the Catterton and Saldana murders for trial, but the trial court denied this motion. Thus unable to try the two cases together, the State elected to try the Catterton murder first and sought to present evidence of the Saldana and Ratchford murders under Rule of Evidence 404(b).

The trial court conducted two hearings, one that started on 6 July 2011, and a second that started on 8 August 2011, to determine what evidence the State could present under this Rule. The July hearing focused on the forecast Saldana evidence. The trial court found several similarities between the Saldana and Catterton murders, including that both decedents were white females who engaged in prostitution, that both had died in defendant's mother's house within a "matter of weeks," that the physical evidence in both cases was consistent to show that both bodies were temporarily stored in defendant's mother's basement closet, and that defendant had disposed of both bodies in York County, South Carolina. Based on these factual similarities, the trial court concluded that much of the Saldana evidence could be presented under Rule 404(b) to show that defendant acted with a common plan, scheme, or design.[1] The trial court also rejected defendant's objection based on Rule of Evidence 403, and concluded that the probative value of the Saldana evidence would not be outweighed by the risks of unfair prejudice, delay, or confusion.

The August hearing focused on the evidence the State sought to present regarding the Ratchford murder. The trial court considered the State's forecast and found several important differences between the two cases, including the remoteness in time between the occurrences, the differences in the causes of death, the dissimilar

---

[1] The trial court specifically allowed the State to introduce several photographs showing Saldana's burnt body at the site where defendant had dumped it in South Carolina. The trial court did, however, exclude others on the basis that they were merely duplicative of those the State would be allowed to present.

alleged motives, and the role of a third party in Ratchford's death but not Catterton's. Based on these differences, the trial court concluded that evidence of the Ratchford murder was inadmissible under both Rule 404(b) and Rule 403.

**Trial**

Opening arguments at the trial for Heather Catterton's murder were delivered on 18 October 2011, and on the same day, the State began to present its case-in-chief. The State's first witnesses testified about the discovery of Catterton's body and the events leading up to her death, and the State focused throughout the trial on the substance of defendant's confessions. By the second day of trial, however, over defendant's continuing objection, the State began also to focus heavily on evidence regarding the death of Randi Saldana. For example, on the second day of trial, a witness described finding the burnt body of Randi Saldana and testifying that it "felt like human flesh." The day after that, the State called Saldana's sister to testify about Saldana's good character and their close relationship. In all, the State presented twelve witnesses who testified about the Saldana death; this presentation spanned seven of the eight days on which the State presented evidence.

The State concedes that "[i]t is true that there was more evidence presented concerning the Saldana murder than there was for the murder of Heather Catterton—at least in part because there simply existed more evidence about the Saldana murder." The State argues that no authority prohibits it from "presenting

Rule 404(b) evidence just because that evidence is worse for defendant than the evidence of the offense for which he is being tried."

Throughout the trial, the State presented at least sixteen photos of Randi Saldana, including more than a dozen photographs of Saldana's charred corpse. The trial court did, however, give repeated instructions to consider the Saldana evidence only insofar as it showed a common plan, scheme, or design involving both deaths.

The State also presented the testimony of medical experts. Anna Schandl, M.D., testified that she had conducted Catterton's autopsy, and that Catterton tested positive for an amount of cocaine which could potentially have been lethal. She also testified that there was no bruising or external trauma around Catterton's neck, but stated that this finding did not necessarily rule out defendant's account that he had strangled Catterton with a cord, pulled her to the floor, stood on her neck for several minutes, and suffocated her with a plastic bag. Ultimately, in her final autopsy report, Dr. Schandl indicated that the cause of Catterton's death was "undetermined."

In contrast with that of the Catterton experts, the testimony regarding the cause of Randi Saldana's death was more certain. The State's sole rebuttal witness was Nicholas Batalis, M.D., who conducted the autopsy on Randi Saldana and described the condition of Saldana's body in some detail, including multiple bruises on her neck and a fracture of her thyroid cartilage. In line with defendant's confession, Dr. Batalis concluded that Saldana had been killed by strangulation.

The defense evidence focused on discrediting the confessions defendant made on 5 December 2009 and then recanted. Defendant took the stand in his own defense to provide a different account of the night Catterton died. According to defendant, once Sommer Heffner left that evening, he and Catterton continued to smoke crack cocaine and have sex at his mother's house. Defendant claimed that they then went to bed, and Catterton was dead when he woke in the morning. Regarding Randi Saldana, he testified that he was performing oral sex on Saldana while squeezing her throat with one hand to intensify her orgasm. He claimed that her death accidentally resulted from his attempt at erotic asphyxiation.

Defendant also attempted to explain why he would falsely confess to multiple offenses, including several murders. Defendant testified that he had been arrested for a series of armed robberies, and that with his previous record, he could face a sentence of almost one hundred years. Defendant claimed that he believed confessing to the other offenses would grant him leverage with prosecutors on the robbery charges, but that he would not be convicted based on his (allegedly false) confessions once the police actually investigated his claims. In short, defendant testified that he falsely confessed in an attempt to "play[ ] the system."

The defense also presented evidence to contradict defendant's earlier claim that he had killed two women in Florida in either 1992 or 2009 and buried their bodies on Merritt Island. Detective Hensley testified that he relayed that information to authorities in Florida, who came to Gastonia to speak with defendant. A Florida

detective testified, however, that no bodies were ever found at that location, that no unsolved murders matched the crimes defendant described, and that police were unable to verify many other details of defendant's statement.

Defense evidence also included the testimony of two medical experts regarding Catterton's cause of death. Forensic toxicologist Andrew Mason, Ph.D., testified that he had reviewed Catterton's toxicology reports and autopsy findings, and that the concentrations of cocaine and cocaine metabolites in her blood might have been, but were not necessarily, the cause of her death. In contrast, defense expert Donald Jason, M.D., a licensed medical doctor and associate professor, was the only expert at trial who offered a conclusion regarding the most likely cause of Heather Catterton's death. He reviewed the autopsy materials prepared by the State's expert, Dr. Schandl, and similarly concluded that Catterton's body had no significant bruises or wounds. He noted that Catterton "did not have any trauma that would be consistent with being cause of death" and concluded "that the most probable cause of death is cocaine toxicity."

Both the State and the defense offered closing arguments on 7 November 2011. The defense emphasized the lack of certainty regarding the cause of Heather Catterton's death and the inconsistencies between the physical evidence and defendant's 5 December 2009 statements to police. The State emphasized the substance of defendant's confessions, the fact that forensic evidence did not preclude defendant's claim that he had suffocated Catterton with a plastic shopping bag,

defendant's history of manipulating others, and that two women, Catterton and Saldana, had been killed.

The next day, 8 November 2011, the jury found defendant guilty of first-degree murder. On 18 November, after a capital sentencing proceeding, the jury found two aggravating circumstances and fourteen mitigating circumstances, and recommended a sentence of death, which the court imposed. Defendant appealed to this Court.

## ANALYSIS

Defendant argues that the trial court committed several errors, the cumulative effect of which deprived him of a fair trial. We agree. We hold that the trial court committed three errors: first, by allowing admission of an excessive amount of the Saldana murder evidence under Evidence Rule 404(b), including more than a dozen photographs of her burnt body; second, by allowing Saldana's sister, Shellie Nations, to testify about Saldana's good character; and third, by allowing the prosecution to argue without basis to the jury that defense counsel had in effect suborned perjury. In light of the cumulative effect of these three errors, "we are unable to conclude that defendant was not unfairly prejudiced." *State v. Rogers*, 355 N.C. 420, 465, 562 S.E.2d 859, 886 (2002) (citation omitted). Accordingly, we vacate the conviction and sentence, and remand to the trial court for a new trial.

**The Saldana Evidence**

Defendant argues that the trial court erred by admitting too much evidence of the Saldana murder, including evidence that showed only differences between the offenses, in violation of Rules of Evidence 404(b) and 403. Our standard of review for this issue contemplates a two-part inquiry:

> [W]hen analyzing rulings applying Rules 404(b) and 403, we conduct distinct inquiries with different standards of review. When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling, as it did here, we look to whether the evidence supports the findings and whether the findings support the conclusions. We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion.

*State v. Beckelheimer*, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012).

Rule 404(b) provides in relevant part that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (2014). Because this Rule disallows the introduction of evidence only when the evidence would be used for a specific forbidden purpose, we have long described Rule 404(b) as a " 'general rule of inclusion.' " *State v. Al-Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 122 (2002) (quoting *State v. Coffey*, 326 N.C. 268, 278, 389 S.E.2d 48, 54 (1990) (emphasis omitted)). In general, Rule 404(b) allows the admission of any evidence, " 'as long as it is relevant to any fact or issue

other than the defendant's propensity to commit the crime.'" *Beckelheimer*, 366 N.C. at 130, 726 S.E.2d at 159 (quoting *State v. White*, 340 N.C. 264, 284, 457 S.E.2d 841, 852-53, *cert. denied*, 516 U.S. 994, 116 S. Ct. 530, 133 L. Ed. 2d 436 (1995)).  However, this Rule is "constrained by the requirements of similarity and temporal proximity;" accordingly, while similarities between the charged crime and the 404(b) crime need not "rise to the level of the unique and bizarre," there must be "some unusual facts present in both crimes that would indicate that the same person committed them." *Id*. at 131, 726 S.E.2d at 159 (citations and internal quotation marks omitted).

Here, the trial court determined, and repeatedly instructed the jury, that the evidence of the Saldana murder could be considered only for the limited purpose of determining whether "there existed in the mind of the defendant a plan, scheme, system, or design involving the crime charged in this case," the Catterton murder. Therefore, under our standard of review, we must examine whether the findings of fact supported the legal conclusion to admit the evidence for this purpose, and whether those findings of fact were themselves supported by competent evidence.

At a two-day hearing conducted in July 2011, the trial court received evidence and heard arguments regarding the admissibility of the Saldana evidence at trial.  In addition to police reports, the trial court had before it the autopsy reports for Catterton and Saldana, as well as defendant's statements to the police.  At the end of the hearing, the trial court made the following findings of fact orally:

> The defendant is charged in this case with the murder of

Heather Catterton. This offense is alleged to have occurred on or about October 17th or 18th, 2009. The defendant made a statement to law enforcement officers on December 5, 2009 and made statements about this matter at various times and places from that date for several days thereafter. . . . The defendant's statements include multiple statements about the killing of Randi Saldana. The death of Randi Saldana is placed as having occurred on or about November 11, 2009, a matter of weeks after the homicide which is the subject of this case. In his . . . written statement, the defendant said, "I also killed Randi Saldana. I killed her because it was business. I was killing two birds with one stone."

The physical evidence accumulated before and after the statement of the defendant is substantial. The killings occurred in the residence of the defendant. The physical evidence is consistent to show that the bodies of each of these women was temporarily placed in a cabinet or closet in the house in the basement area of [defendant's mother's house]. . . .

Both bodies were subsequently removed by the defendant and taken to South Carolina and disposed of in remote locations and clothing of the two individuals was disposed of by being deposited in other remote locations. Both bodies were found at the same place at which the evidence tends to show the defendant placed or disposed of the bodies. The Catterton remains were found on October 29, 2009 in York County. The Saldana remains were found November 15, 2009 in York County. . . .

Autopsies were conducted by the Medical University of South Carolina in each case. In regard to the Catterton autopsy, the cause of death was undetermined by the examining physicians and the manner of death was undetermined as reflected in that report. . . .

In regard to the Saldana [case], that autopsy which was performed 11-17-09, results in a finding of [cause of] death of strangulation, manner of death homicide.

Internal and external examination results are part of that report. Final diagnosis is strangulation. Fracture of the thyroid cartilage is indicated and soft tissue injury to the neck. The Saldana body was burned before it was discovered.

The defendant described his actions in regard to the Catterton killing and her actions in the house. As to both he describes the drug use and the communal use of drugs by the defendant and each of the victims and others before the killings.

. . . .

As to the victims, they are both white females. They both apparently were prostitutes. Each of them was an acquaintance of the defendant, not a stranger. Both of them were acquaintances with whom he had shared sexual relationships and drug use along with others. In regard to what is involved, the what is the . . . homicide in both cases. . . .

The proximity in time of these cases is close. It is not a temporal extended time, a matter of weeks. Why, in regard to motive, there does seem to be a similarity in regard to what the defendant says his reasons were and that was because of his contention they were having sex with black men. . . . .

The evidence apart from the autopsies is sufficient to show a method employed by the defendant. . . . Both would be manual violence as opposed to a blade or a firearm or a drowning. Both of them involve a manual killing. The similarities in the pattern of events on each occasion shows a plan or design.

Based on these findings, the trial court concluded that the evidence was admissible under Rule 404(b). The trial court emphasized: "I want to be clear about this. The same similarities and the method of disposing of the bodies and garments all show

-16-

the plan, design and scheme aspect of this rule."

We hold that the trial court properly admitted evidence of the Saldana murder under Rule 404(b). Competent evidence—particularly the autopsy reports and defendant's 5 December 2009 statement to the police—supported the trial court's oral findings of fact, and these findings of fact supported the trial court's conclusion that the Saldana evidence could be used to show a common plan or design. Because this evidence was probative of more than defendant's propensity to commit murder, namely that the Catterton murder was part of a common plan, design, or course of conduct, we conclude that Rule 404(b) did not preclude the admission of evidence concerning the Saldana murder.

This conclusion, however, is not the end of our inquiry. Though Rule 404(b) is a "general rule of inclusion," *Al-Bayyinah*, 356 N.C. at 154, 567 S.E.2d at 122, Rule 403 supplies an independent limitation on the ability of trial courts to admit evidence under that Rule. Rule 403 provides in full:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C.G.S. § 8C-1, Rule 403 (2014). Once a trial court has weighed the likely probative and prejudicial value of evidence a party has sought to admit over an objection, we review only for abuse of discretion. *Beckelheimer*, 366 N.C. at 130, 726 S.E.2d at 159. This standard is deferential, and we will disturb the trial court's decision only when

it crosses the line from potentially reasoned to necessarily arbitrary. *See, e.g., State v. Hyatt*, 355 N.C. 642, 662, 566 S.E.2d 61, 74-75 (2002), *cert. denied*, 537 U.S. 1133, 123 S. Ct. 916, 154 L. Ed. 2d 823 (2003).

In conducting this analysis, we note the particular dangers presented by Rule 404(b) evidence. The United States Supreme Court long ago described how such evidence can be misused, especially by allowing the jury to convict the accused for a crime not actually before it. *See Michelson v. United States*, 335 U.S. 469, 475-76, 69 S. Ct. 213, 218, 93 L. Ed. 168, 174 (1948) ("The inquiry [into character] is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." (footnote omitted)). Our own, more recent decisions have recognized the same risks. *See, e.g.*, *State v. Carpenter*, 361 N.C. 382, 387-88, 646 S.E.2d 105, 109 (2007) ("When evidence of a prior crime is introduced, the natural and inevitable tendency for a judge or jury is to give excessive weight to the vicious record of crime thus exhibited and either to allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge." (citations and internal quotation marks omitted)). Accordingly, because of this " 'dangerous tendency . . . to mislead and raise a legally spurious presumption of guilt' " we have required that such evidence " 'be subjected to strict scrutiny by the courts.' " *Al-Bayyinah*, 356 N.C. at 154, 567 S.E.2d at 122 (quoting *State v. Johnson*, 317 N.C. 417,

430, 347 S.E.2d 7, 15 (1986)). Here, those dangers were particularly acute, and so our scrutiny in this capital case must be particularly careful.

Defendant does not argue that he was not present when Heather Catterton died, nor does he contest that he hid, then later disposed of, her body and that of Randi Saldana. The principal contested issue of fact at trial was the cause of Heather Catterton's death. None of the expert witnesses was able definitively to determine the cause of her death. None identified any internal or external trauma to Catterton's chest or neck; in contrast, three testified that her death may have resulted from cocaine toxicity. Indeed, one defense expert specifically concluded that Catterton "did not have any trauma that would be consistent with being [the] cause of death" and that "the most probable cause of death is cocaine toxicity." Given this forensic uncertainty, the Saldana evidence likely weighed heavily in the jury's deliberations.

We also note the nature and extent of the evidence presented concerning the Saldana murder. The State began to present this evidence on only the second day of the guilt-innocence phase of the trial and continued to present it on seven of the eight days it offered evidence, up to the day before closing arguments. In addition, because Saldana's body had been burned while Catterton's had not, much of this evidence concerned a key difference between the two deaths, rather than a similarity as anticipated under Rule 404(b). One of the State's first witnesses testified what it felt like to touch Saldana's body, and the jury viewed over a dozen photographs depicting

Saldana's scorched remains. Our own review of the photographs confirms their stark and unsettling nature.

Our review has uncovered no North Carolina case in which it is clear that the State relied so extensively, both in its case-in-chief and in rebuttal, on Rule 404(b) evidence about a victim for whose murder the accused was not currently being tried. To the contrary, we have granted relief when the circumstances reveal a distinct risk that the jury may have been led to convict based on evidence of an offense not then before it. In *State v. Al-Bayyinah*, for example, we awarded a new trial in a capital case when Rule 404(b) evidence focused on earlier robberies "that were factually dissimilar to the robbery and murder charged" in that case. 356 N.C. at 155, 567 S.E.2d at 123 (citing *State v. Lynch*, 334 N.C. 402, 412, 432 S.E.2d 349, 354 (1993)). *But see generally State v. Peterson*, 361 N.C. 587, 652 S.E.2d 216 (2007) (allowing a large amount of 404(b) evidence), *cert. denied*, 552 U.S. 1271, 128 S. Ct. 1682, 170 L. Ed. 2d 377 (2008); *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991) (same). We have also identified cases addressing similar scenarios in other states, and we find them instructive.

Most similar is the 2000 decision in *Flowers v. State*, a capital case from Mississippi. *See generally* 773 So. 2d 309 (Miss. 2000). There, the defendant was on trial for one murder, although he had also been charged with three other homicides likely committed at the same time. *See id.* at 313. As here, a motion to consolidate the cases for trial was denied. *Id.* And, as here, the State sought to use Rule 404(b)

to introduce copious evidence of the other three murders, including graphic photographic evidence, effectively proceeding as if the motion to try the offenses together had been allowed. *See id.* at 318-21. Based on this error, and its cumulative effect when considered with other errors, the Mississippi Supreme Court reversed the trial court's judgment and remanded for a new trial. *Id.* at 317, 334. In doing so, the appellate court remarked with palpable derision on the State's tactic of using evidence of an incendiary separate offense to arouse the passions of the jury:

> It is the "necessity" by the State to use the other evidence of three killings in order to tell a coherent story that is the key to its admissibility. The case at bar is not one of those cases so interconnected that mention of the other three murders is necessary to tell the whole story. Certainly it is not to the extent employed by the prosecution in the case at bar. Here, however, a pattern of trial tactic commenced at the beginning of trial and was continued by the prosecutor throughout the guilt phase of the proceedings including closing argument. If the evidence relating to the other three murders was relevant to any one of the acceptable purposes listed in Miss. R. Evid. 404(b), a description of the crime scene may have been helpful. However, the numerous additional descriptions of the other victims and photographs could do nothing but inflame the jury.

*Id.* at 324. If anything, the differences between Catterton's death and Saldana's death, and the lack of an obvious connection between the offenses, render the evidence of Saldana's death even less "necessary" than the 404(b) evidence in *Flowers*. Accordingly, the concerns in *Flowers* about inflaming the jury pertain here as well.

In this context—in which Heather Catterton's cause of death was uncertain, and the Rule 404(b) evidence was so emotionally charged—we conclude that the decision to allow the State to present so much evidence about the Saldana murder stretched beyond the trial court's broad discretion. While the State possesses considerable leeway in presenting even "gory, gruesome, horrible or revolting" photographs of homicide victims, *State v. Chapman*, 359 N.C. 328, 350, 611 S.E.2d 794, 812 (2005) (citations and quotation marks omitted), that leeway ends where the additional photographs "add nothing in the way of probative value but tend solely to inflame the jurors," *State v. Roache*, 358 N.C. 243, 285, 595 S.E.2d 381, 409 (2004) (citations and quotation marks omitted). Accordingly, we hold that the trial court erred in allowing the admission of an excessive amount of evidence about Saldana, particularly photographic evidence, when the probative value of the sum total of that evidence was substantially outweighed by the risks that it would confuse the issues before the jury, or lead the jury to convict defendant based on evidence of a crime not actually before it.

**Shellie Nations's Testimony**

The second relevant error concerns the testimony of Randi Saldana's sister, Shellie Nations. More specifically, defendant argues that the trial court erred by allowing Nations to testify, over defendant's objection, about Randi Saldana's good character. Defendant contends that this testimony was inadmissible because it was irrelevant to the crime charged—the murder of Heather Catterton—and because any

probative value the testimony might have had was substantially outweighed by the danger of unfair prejudice. We agree.

It is axiomatic that only relevant evidence is admissible at trial, while irrelevant evidence is inadmissible. *See, e.g.*, *State v. Berry*, 356 N.C. 490, 504, 573 S.E.2d 132, 143 (2002). Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2014). Evidence of a victim's character, or of the effect of the victim's death on others, is only rarely relevant when making a determination of guilt. *See State v. Maske*, 358 N.C. 40, 50, 591 S.E.2d 521, 528 (2004) ("[U]nless admissible under Rule 404(a)(2). . . . character evidence of a victim is usually irrelevant during the guilt-innocence portion of a capital trial, as is victim-impact evidence." (citing N.C. R. Civ. P. 404(a)(2), *State v. Abraham*, 338 N.C. 315, 352-53, 451 S.E.2d 131, 151 (1994), and *State v. Oliver*, 309 N.C. 326, 360, 307 S.E.2d 304, 326 (1983))). It follows *a fortiori* that evidence concerning the character of a victim of a separate crime will be relevant in even fewer circumstances. Furthermore, even when evidence is admissible because it satisfies the low bar of logical relevance, that evidence must still be excluded when its probative value is substantially outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rule 403. Here, the trial court admitted, over defendant's objection, Shelly Nations's testimony about Saldana's good character. Nations testified during direct examination as follows:

[by the State] Q. Do you know someone or did you know someone by the name of Randi Saldana?

A. Yes, ma'am.

Q. And what was the relationship that you had with Miss Saldana?

A. That was my sister.

Q. Was she a younger sister or was an older sister?

A. She was a year younger.

Q. A year younger? Describe what Randi was like.

A. She was very free spirit, charismatic. She had a heart of gold.

[Defense counsel]: I'm going to object, your Honor. [The trial court then overruled the objection but offered a limiting instruction.]

. . . .

[by the State] Q. Okay. You indicated that she was charismatic and had a heart of gold.

A. Yeah. Randi, she was the type of person if you asked her for something and you needed it, the way we were raised is you gave it, you know, and you gave it with good intentions. She never really wanted to hurt anyone with the intentions of hurting them, you know. She was the type of person if she knew that—if she had known that she had hurt your feelings, she would come back and she would freely apologize and admit to her wrong in that, you know, for the most part. Randi and I were raised together our whole lives and I can't even count on one hand the arguments my sister and I had. She was just the type of person, she would express her feelings, and, you know, she just—she was a good person.

We hold that the trial court erred by allowing this testimony. It is difficult to discern any probative value that testimony about Randi Saldana's good character could have had to the issue of whether defendant caused the death of Heather Catterton. *See Abraham*, 338 N.C. at 352-53, 451 S.E.2d at 151 (" 'Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened.' " (quoting N.C. R. Evid. 404 official commentary)). The State appears to concede this point and argues instead that any error was harmless because "[t]he bottom line is that there is little likelihood that Nations' testimony concerning Saldana's character made any difference in this case whatsoever." In light of this complete lack of relevance, we hold that the trial court should not have allowed this evidence over defendant's objection based on Rule 403.

**Improper Statements Made During the State's Closing Argument**

The third relevant error concerns statements made by the State during closing arguments at the guilt-innocence phase of the trial. More specifically, defendant argues that the State made multiple improper statements, including several that impermissibly accused defense counsel of suborning perjury. We agree.

During closing arguments, prosecutors are barred by statute from "becom[ing] abusive, inject[ing their] personal experiences, [and] express[ing their] personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant." N.C.G.S. § 15A-1230 (2014). Within those confines, however, we have long recognized that " 'generally, prosecutors are given wide latitude in the scope of their argument and may argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom.' " *State v. Phillips*, 365 N.C. 103, 135, 711 S.E.2d 122, 145 (2011) (brackets omitted) (quoting *State v. Goss*, 361 N.C. 610, 626, 651 S.E.2d 867, 877 (2007), *cert. denied*, 555 U.S. 835, 129 S. Ct. 59, 172 L. Ed. 2d 58 (2008)) (internal quotation marks omitted), *cert. denied*, __ U.S. __, 132 S. Ct. 1541, 182 L. Ed. 2d 176 (2012). This latitude is reflected in our deferential standards of review. When opposing counsel objects during a closing argument, we review for abuse of discretion. *State v. Walters*, 357 N.C. 68, 101, 588 S.E.2d 344, 364, *cert. denied*, 540 U.S. 971, 124 S. Ct. 442, 157 L. Ed. 2d 320 (2003). When there is no objection, we review for gross impropriety. *Phillips*, 365 N.C. at 143, 711 S.E.2d at 150. In all cases, we view the remarks "in context and in light of the overall factual circumstances to which they refer." *Id.* at 135, 711 S.E.2d at 145 (citations and quotation marks omitted).

Judicial deference, however, is not unlimited. In particular, "we have found grossly improper the practice of flatly calling a witness or opposing counsel a liar when there has been no evidence to support the allegation." *Rogers*, 355 N.C. at 462,

562 S.E.2d at 885 (citations omitted); *see also State v. Locklear*, 294 N.C. 210, 217, 241 S.E.2d 65, 70 (1978) ("It is improper for a lawyer to assert his opinion that a witness is lying. He can argue to the jury that they should not believe a witness, but he should not call him a liar." (citations and internal quotation marks omitted)). Despite this prohibition, several statements made during the course of the State's closing argument had just this effect.

Shortly after beginning its closing argument, the State suggested that defendant had manipulated his attorneys into misleading the jury. The prosecutor argued:

> He [defendant] has manipulated his attorneys. Don't let him manipulate you. Don't let him work the system again. . . . [Y]ou heard video confessions of how he killed Heather Catterton and Randi Saldana. And then the defense started, they started putting up these smoke screens, started to try to confuse you.

While this particular statement was borderline, and may have referred to defendant himself rather than defense counsel, the intimations became more direct as the argument progressed. Just a few minutes later, the State argued:

> [A]t no point, no point in the last 18 months since this has been pending trial, has he ever recanted killing Heather or Randi. Never. Not until two years later when he could look at everything, when he can study the evidence, when he can get legal advi[c]e from his attorneys, does he come up with this elaborate tale as to what took place.

Almost immediately, the State emphasized this point a second time:

> Two years later, after he gives all these confessions

to the police and says exactly how he killed Heather and Randi Saldana . . . the defense starts. The defendant, along with his two attorneys, come together to try and create some sort of story.

In response to this third statement, defense counsel objected and the trial court sustained the objection; however, the trial judge offered no corrective instruction, but instead told the jury only that he would "sustain the objection as to the argument and odd comment." Despite this ruling and judicial admonition, the prosecutor continued in a similar vein. In conclusion, the prosecutor argued:

> Think back to December 5th of 2009 when he knew nothing, when he had no legal advice; consistently, voluntarily told the police everything, and it was consistent with what the evidence showed. . . . For hours you watched this man confess to killing Heather and Randi Saldana, and now, after 18 months to two years, the defense begins and they put up smoke screens and they tried to confuse you? . . . We've got two women dead, and he killed them. I ask that you find the defendant guilty, first-degree murder, of killing Heather Catterton. Thank you.

In context, the import of these arguments is clear: The State argued to the jury, not only that defendant had confessed truly and recanted falsely, but that he had lied on the stand in cooperation with defense counsel. Whether or not defendant committed perjury, there was no evidence showing that he had done so at the behest of his attorneys. Accordingly, we hold that the prosecutor's statements to this effect were grossly improper, and the trial court erred by failing to intervene *ex mero motu*.

**CONCLUSION**

Defendant has identified three errors that occurred during his capital trial for the murder of Heather Catterton. Regardless of whether any single error would have been prejudicial in isolation, we conclude that the cumulative effect of these three errors deprived defendant of a fair trial. Accordingly, we vacate defendant's conviction and sentence, and remand for a new trial. Because of our disposition of this case, we conclude it is unnecessary to address defendant's motion for appropriate relief; we therefore dismiss defendant's MAR as moot.

NEW TRIAL.

Justice ERVIN did not participate in the consideration or decision of this case.

Justice NEWBY dissenting.

At trial the State presented not one, but two, videotaped confessions by defendant, a third video of defendant at the crime scene explaining the details of the murder to police, and an abundance of corroborating physical evidence to support the confessions. In court defendant recanted his prior statements and testified that he fabricated the murder confessions to avoid longer prison sentences on several robbery charges. After hearing evidence and weighing the credibility of the witnesses, in less than four hours of deliberation, the jury found defendant guilty of first-degree

murder. Despite overwhelming evidence of his guilt, the majority unconvincingly asserts that defendant's claims of error were prejudicial requiring a new trial even under the deferential standard of review applicable to each submitted claim. Accordingly, I respectfully dissent.

The majority points to three alleged errors at trial: (1) the admission of victim character testimony from Randi Saldana's sister, Shelly Nations; (2) the admission of too much evidence of defendant's murder of Saldana under North Carolina Rule of Evidence 404(b), particularly the number of photographs of Saldana's burned body; and (3) several comments made by the prosecutor during closing argument. I agree with the majority that the trial court impermissibly admitted Nations's testimony; however, the conflicting evidence of Saldana's lifestyle of drug use and prostitution rendered any effect of that testimony negligible. The remaining allegations do not establish error, much less prejudicial error.

In this case the pivotal question decided by the jury was the credibility of defendant's numerous and detailed incriminatory statements to police against his conflicting testimony at trial. The State's evidence included two separate videotaped interviews with detectives in which defendant confessed to choking to death both Heather Catterton and Randi Saldana. The State also presented a video of defendant showing detectives where he disposed of Catterton's clothing and belongings following her murder and a video of defendant giving detectives a detailed walk-

through of his mother's home, where the two murders occurred. The scientific evidence was inconclusive. Seeking to undermine his pretrial assertions, defendant testified at trial that he initially confessed to the two murders in the hope of receiving leniency on several pending robbery charges. Defendant further testified that Catterton died in his mother's home from a drug overdose and that Saldana died in the same home from voluntary, sex-related asphyxiation, both within a month of each other. His initial confessions and his later conflicting trial testimony regarding the deaths of Catterton and Saldana could not have both been true.

The majority correctly holds that the trial court properly admitted evidence of Saldana's murder under North Carolina Rules of Evidence 404(b) to show defendant acted with a common scheme, plan, or design. Defendant repeatedly confessed that he strangled Saldana and suffocated Catterton. Saldana's autopsy report confirmed that she was strangled to death, while Catterton's cause of death remained inconclusive. In response, the State presented Rule 404(b) evidence of Saldana's murder by strangulation to prove that defendant, as he confessed, also intentionally suffocated Catterton. Saldana's murder undoubtedly satisfies the Rule 404(b) criteria: Defendant confessed to both murders during the same interviews with police; both victims were young, white female prostitutes who exchanged sex with defendant for drugs; their circles of acquaintances overlapped significantly; both had sex with defendant in the same trailer; both died in his mother's house; both of the victims' bodies were temporarily stored in the basement of the home where they died

and later dumped in rural areas of York County, South Carolina; defendant admitted that he killed both by either strangulation or suffocation; and lastly, both victims died within a month of each other. *See State v. Howell*, 343 N.C. 229, 236, 470 S.E.2d 38, 42 (1996) (upholding the admission of 404(b) evidence to prove the defendant's identity, common plan, and lack of mistake when both victims were black prostitutes and both were picked up by the defendant in the same area, taken to the defendant's bus at night, and bound, one with wire and the other with duct tape).

Notwithstanding the conclusion that the evidence was admissible under 404(b), the majority holds that the trial court abused its discretion under North Carolina Rule of Evidence 403 in admitting "an excessive amount" of the 404(b) evidence. To justify reversal, a trial court's ruling on a Rule 403 determination must be "manifestly unsupported by reason or . . . so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988) (citation omitted). The majority classifies the trial court's decision as necessarily arbitrary, but gives no guidance to the trial court upon retrial on where to draw the line, how much evidence is too much, or what particular evidence is prohibited.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence." N.C. R. Evid. 403. In the context of the Rule 403 balancing test, the prosecution is entitled to put on its case and should not be penalized because the acts a defendant is accused of committing are particularly gruesome. The United States Supreme Court has noted:

> When a juror's duty does seem hard, the evidentiary account of what a defendant has thought and done can accomplish what no set of abstract statements ever could, not just to prove a fact but to establish its human significance, and so to implicate the law's moral underpinnings and a juror's obligation to sit in judgment. Thus, the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault.

*Old Chief v. United States*, 519 U.S. 172, 187-88, 117 S. Ct. 644, 653-54, 136 L. Ed. 2d 574, 592 (1997). This "persuasive power of the concrete and particular" is especially important in capital cases in which grisly details arise quite frequently. *Id.* at 187, 117 S. Ct. at 653, 136 L. Ed. 2d at 592. The more relevant the State's evidence is, the more likely it is to persuade the jury of a defendant's guilt of the particular crime charged. Rule 403 does not prohibit probative evidence simply because it strongly influences the jury's verdict or the State relies on it heavily at trial.

The majority ignores the highly probative nature of the Saldana 404(b) evidence and then fails to identify any unfair prejudice that substantially outweighs its probative value. Against defendant's assertions that he contrived the portion of

his videotaped confessions describing how he killed Catterton and Saldana, the Saldana 404(b) evidence serves to establish that Saldana was in fact strangled. The physical evidence of Saldana's murder corroborates defendant's confession that he killed her and, considering the striking similarities in the two murders, discredits defendant's recantation of his confession to the Catterton murder. Defendant entwined details of the two murders throughout his taped confessions, making the Saldana 404(b) evidence an unavoidable and significant part of the State's case-in-chief. Further, many of the State's witnesses were familiar with both murders and testified as to their knowledge. Nonetheless, ignoring the interrelationship of the two murder investigations, the majority believes the highly probative 404(b) evidence is unfairly prejudicial in part simply because the State referenced it on seven of the eight days it presented evidence at trial. Without any support from our case law, the majority creates a vague, unworkable rule that limits admissible evidence under Rule 403 and discourages the State from relying on probative evidence. In so concluding, the majority fails to adhere to the deferential standard of review for abuse of discretion.

Whether photographic evidence "is more probative than prejudicial and what constitutes an excessive number of photographs in the light of the illustrative value of each . . . lies within the discretion of the trial court." *Hennis,* 323 N.C. at 285, 372 S.E.2d at 527 (citation omitted). "Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are

used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *Id.* at 284, 372 S.E.2d at 526 (citations omitted). "When a photograph add[s] nothing to the State's case, then its probative value is nil, and nothing remains but its tendency to prejudice." *Id.* at 286, 372 S.E.2d at 527 (internal citations and quotation marks omitted). "This Court has rarely held the use of photographic evidence to be unfairly prejudicial . . . ." *State v. Robinson*, 327 N.C. 346, 357, 395 S.E.2d 402, 409 (1990).

The majority states in conclusory fashion that the trial court erred in admitting some of the photographs of Saldana's body because those photographs add nothing of probative value under Rule 403. A careful analysis of the photographs refutes this conclusion. Of the fifteen photographs at issue, the first three photographs (Exhibits 45, 46, and 47) depicted Saldana's burned body lying substantially covered in debris in a wooded area. Two of those photographs were taken from a distance and from different angles. The third photograph was a close-up of the body. The witness who first found the body used these three photographs to show the rural nature of the area and the body's appearance upon its discovery. This testimony corroborated defendant's videotaped confession regarding his disposal of Saldana's body.

The State submitted the next six photographs to illustrate the testimony of a sheriff's deputy who responded to the call that a body had been found. Four of those photographs were of Saldana's body: Exhibit 50 shows a close-up of the wire found

wrapped around Saldana's legs, which defendant confessed to using; Exhibits 51 and 52 further show the wire wrapped around Saldana's legs, and Exhibit 53 shows Saldana's burned right arm and hand. Though unpleasant to view, these photographs were highly probative in connecting the physical evidence of Saldana's body's condition to defendant's detailed confession, particularly that he wrapped a lamp cord around Saldana's legs.

The remaining ten photographs in question, used to clarify testimony from the coroner and Saldana's sister, showed Saldana's body after it had been cleaned of debris and prepared for autopsy on the coroner's examining table. Before the coroner testified, the trial court considered, and excluded upon defendant's objection, two of these photographs—Exhibits 60 and 61—as unnecessarily cumulative. Exhibits 57, 58, 59, 62, and 63 aided the coroner's testimony to show the victim's neck injuries and corroborated defendant's videotaped confession that he choked Saldana to death. Exhibits 58, 59, 62, and 63, though graphic, showed the victim's head and torso injuries from different viewpoints. The last photograph focused on the injury to the victim's forehead as described by defendant in his videotaped confession and trial testimony. Three photographs, Exhibits 54, 55, and 56, served to identify the victim by focusing on unique tattoos located on relatively undamaged parts of her body. These depictions were not gruesome and did not present a high risk of prejudice. Saldana's sister described the tattoos, referring to these three photographs during her testimony. These highly probative, standard autopsy photographs, though

unsettling, confirm the victim's identity and the condition of her body, allowing the triers of fact to assess the veracity of defendant's confessions and the similarities in the victims' conditions.

These fifteen photographs of the body helped identify the victim and corroborated defendant's pretrial confessions that he strangled, burned, and bound Saldana, and disposed of the body in a rural, wooded area. This Court defers to a trial court's exercise of discretion in allowing such photographs. In *State v. Robinson* we upheld the trial court's admission of twenty-three photographs, eleven of which showed a victim's burned body, his autopsy, or the burned car containing the victim. 327 N.C. at 355, 395 S.E.2d at 407. We concluded that the photographs were not needlessly repetitive, that competent testimony accompanied each photograph, and that each portrayed " 'somewhat different scenes.' " *Id.* at 358, 395 S.E.2d at 409 (quoting *State v. Dollar*, 292 N.C. 344, 355, 233 S.E.2d 521, 527 (1977)). *Compare State v. Waring*, 364 N.C. 443, 497, 701 S.E.2d 615, 649 (2010) (finding no abuse of discretion when the trial court admitted eighteen autopsy photographs because the photographs "were not unnecessarily repetitive, were not unduly gruesome or inflammatory, and illustrated [witness and defendant testimony]"), *cert. denied*, ___ U.S. ___, 132 S. Ct. 132, 181 L. Ed. 2d 53 (2001), *with Hennis*, 323 N.C. at 282, 372 S.E.2d at 525 (finding prejudicial error when, *inter alia*, thirty-five images measuring three feet, ten inches by five feet, six inches showing three murder victims' decomposing bodies and repetitive photographs of the same neck injury on all three

bodies were projected on the wall directly above the defendant's head). Under a straightforward application of our precedent, the trial court did not abuse its discretion in admitting the fifteen photographs here, each serving a different illustrative purpose.

In its last finding of error, the majority insists the State made inappropriate statements to the jury in its closing argument. "It is well settled that the arguments of counsel are left largely to the control and discretion of the trial judge and that counsel will be granted wide latitude in the argument of hotly contested cases." *State v. Williams*, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986) (citations omitted). "Counsel is permitted to argue the facts which have been presented, as well as reasonable inferences which can be drawn therefrom." *Id.* (citations omitted). We review for abuse of discretion objections made to a party's closing argument, *State v. Walters*, 357 N.C. 68, 101, 588 S.E.2d 344, 364, *cert. denied*, 540 U.S. 971, 124 S. Ct. 442, 157 L. Ed. 320 (2003), but "the impropriety of the argument must be gross indeed" for us to hold that the trial court abused its discretion by not "correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it," *State v. Rogers*, 355 N.C. 420, 462, 562 S.E.2d 859, 885 (2002) (citation and quotation marks omitted).

The majority contends that it was grossly improper for the trial court not to intervene unilaterally when the State, in the majority's view, accused defense counsel

of suborning perjury and defendant of being a liar. The majority's mischaracterization ignores our deferential standard of review and disregards defendant's and defense counsel's own declarations. While I agree with the majority that the State strayed too far in its closing argument by saying that "defendant, along with his two attorneys, c[a]me together to try and create some sort of story," the trial court properly sustained defendant's objection to those remarks. Nowhere does the State argue that defendant's attorneys told him to lie in his testimony.

Defendant's major premise here was that his trial testimony was true and that his videotaped confessions were false. In its closing argument, the State submitted that defendant came up with "this elaborate tale as to what took place" after "get[ting] legal advi[c]e from his attorneys." There is nothing grossly improper in the State suggesting that defense counsel provided legal advice to defendant or that defendant contemplated recanting his confessions after his attorneys informed him of the legal consequences of confessing to the murders. Furthermore, defendant himself testified to being manipulative and untruthful. On cross-examination, defendant freely admitted to manipulating the justice system during the over twenty-five years he had been in and out of prison:

Q [from the State]. You manipulated the system?

A. Well, I mean, I choose to call it working the system. Manipulation is, you know, in the eye of the beholder. I don't know. I just work the system. I do whatever is best for me. If you want to call it manipulation, then that's fine, I guess.

Defense counsel reinforced defendant's admission during closing argument: "[Defendant is] manipulative, he lies, he tells things to get things. . . . His family says he lies. . . . He lies to bolster himself." Perhaps the one fact both sides agreed on throughout the trial was that defendant was not always truthful. The majority concludes, contrary to precedent, that the trial court erred in allowing the State to agree with the assertions repeatedly made by defendant and his counsel to this effect. *Williams*, 317 N.C. at 481, 346 S.E.2d at 410 ("Counsel is permitted to argue the facts which have been presented . . . .").

The majority has identified three potential errors over the course of a five-week trial and summarily concludes that these alleged errors when considered together prejudiced defendant's trial. The identification of alleged errors, however, is not reversible per se; defendant must demonstrate that "there is a reasonable possibility that, had the error[s] in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a) (2013). *See State v. Badgett*, 361 N.C. 234, 248, 644 S.E.2d 206, 215, *cert. denied*, 552 U.S. 997, 128 S. Ct. 502, 169 L. Ed. 2d 351 (2007) (concluding admission of the defendant's prior conviction was harmless when the "defendant has failed to demonstrate any reasonable possibility that the jury would have reached a different result had the evidence been excluded"); *State v. DeLeonardo*, 315 N.C. 762, 772, 340 S.E.2d 350, 357 (1986) ("Even assuming error *arguendo*, defendant has failed to meet his burden of showing that a reasonable

possibility exists, that had the evidence . . . not been admitted, a different result would have been reached at his trial.").

As stated earlier, I agree the trial court erred by admitting Nations's victim character testimony but the conflicting evidence of Saldana's lifestyle of drug use and prostitution negated any effect of that testimony. Thus, defendant must show the two additional alleged errors, the admission of "an excessive amount" of 404(b) evidence and several comments by the prosecutor during closing argument, created a "reasonable possibility" of changing the jury's verdict. Regarding the 404(b) evidence, the trial court continually instructed the jury, often multiple times a day, that the evidence

> is offered, and you may consider it, for the purpose of showing that there existed in the mind of the defendant a plan, scheme, system, or design involving the crime charged in this case, and you may not consider it for any other purpose in regard to the trial of this case.

The trial court repeatedly and consistently urged the jury to use the evidence only as instructed throughout the trial:

> [L]et me put it this way: Evidence has been received tending to show that Randi Saldana died under circumstances that have some similarity to the charge against the defendant in the case that we are trying, and the case we're trying is the one which he is charged with the murder of Heather Catterton. Now, this evidence was received, and will be received and considered by you, solely for the purpose of showing that the defendant had existing in his mind a plan, scheme, system, or design involving the crime charged in this case.

. . . .

> I want you to understand that if you believe this evidence, you may consider it but only for the limited purpose for which it has been received or may be received subsequently. You may not consider such evidence about the Saldana matter for any other purpose.

. . . . .

> Now, members of the jury, at this point I'm going to give you an instruction that's just simply the same instruction I gave you before. That information previously received through the evidence, testimony in regard to Randi Saldana, has a limited purpose . . . .

. . . .

> This evidence has been received solely for the purpose of showing any of the following: That the defendant had a motive for the commission of the crime charged in this case; that the defendant had the intent which is a necessary element of the crime charged in this case; that there existed in the mind of the defendant a plan, scheme, system, or design involving the crime charged in this case; that the defendant had the opportunity to commit the crime in this case; or the absence of accident in this case.

> The state contends, and the defendant denies, that the evidence on this matter shows these things in regard to the offense charged, that is, the murder of Heather Catterton. It is for you to decide what, in fact, the evidence does show. If you believe this evidence, you may consider it, but only for the limited purposes for which it has been received.

Similarly, during closing argument, when defendant objected to the prosecutor's statement, the trial court "sustain[ed] the objection as to the argument and the odd comment."

Most importantly, here there is overwhelming evidence of defendant's guilt, including the multiple detailed confessions to the murder he provided shortly after his arrest. An abundance of corroborating physical evidence supported defendant's confessions. Defendant's only defense was that he had fabricated his confessions. The jury took little time, less than four hours, to reject defendant's recantation and find him guilty. Defendant has failed to carry his burden of showing any reasonable possibility that the jury would have reached a different result absent the alleged errors.

The trial court determines the competency of evidence, including witness testimony, while the jury weighs the credibility of the evidence presented. *State v. Witherspoon*, 210 N.C. 647, 649, 188 S.E. 111, 112 (1936) (citation omitted). Here the jury found credible defendant's taped confessions, not his trial testimony. Defendant has failed to show that absent the alleged errors the trial's outcome would have been different. This Court should uphold the jury's determination of defendant's guilt. Accordingly, I respectfully dissent.

Chief Justice MARTIN joins in this dissenting opinion.