IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-495

No. COA20-566

Filed 21 September 2021

New Hanover County, No. 16CRS007232

STATE OF NORTH CAROLINA

v.

JAMES OPLETON BRADLEY, Defendant.

Appeal by Defendant from judgment entered 4 April 2019 by Judge Douglas B. Sasser in New Hanover County Superior Court. Heard in the Court of Appeals 9 June 2021.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Joseph L. Hyde, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Heidi Reiner, for Defendant-Appellant.*

INMAN, Judge.

¶ 1 Elisha Tucker ("Ms. Tucker"), a resident of New Hanover County and girlfriend of Defendant James Opleton Bradley ("Defendant"), was reported missing by her mother in October 2013. Six months later, after law enforcement investigation of Ms. Tucker's case had gone cold, Shannon Rippy Van Newkirk ("Ms. Rippy"), Defendant's co-worker and another of his romantic interests, disappeared from her home in Wilmington. Defendant made numerous false statements about his possible

involvement in Ms. Rippy's disappearance, leading police to search Defendant's jobsite for her body. There, police found a woman's nude corpse, bound in the fetal position by duct tape and wrapped in three trash bags, in a shallow grave beneath a tree stump. An autopsy later revealed the body belonged to Ms. Tucker. Ms. Rippy has never been found. [1]

¶ 2    Defendant appeals from a judgment entered following a jury verdict finding him guilty of first-degree murder in the death of Ms. Tucker. Defendant asserts prejudicial error in: (1) the admission of evidence concerning Ms. Rippy's disappearance; (2) allegedly improper closing arguments by the State; and (3) the denial of his motion to dismiss the first-degree murder charge for insufficient evidence of premeditation and deliberation. After careful review, we hold Defendant has failed to demonstrate prejudicial error.

## I.    <u>FACTUAL AND PROCEDURAL HISTORY</u>

¶ 3    The record below tends to show the following:

### 1. *Ms. Tucker's Disappearance*

¶ 4    On 21 October 2013, Rose Waldron ("Ms. Waldron") reported her 34-year-old daughter, Ms. Tucker, missing. Ms. Waldron had filed several missing persons

---

[1] Defendant was tried and convicted for the murder of Ms. Rippy in 2017, and this Court affirmed his conviction in 2018. *State v. Bradley*, 262 N.C. App. 373, 820 S.E.2d 129, 2018 WL 5796233 (2018) (unpublished), *petition for disc. rev. denied*, 372 N.C. 61, 822 S.E.2d 630 (2019).

reports previously, as her daughter lived a troubled life that included a heroin addiction, prostitution, homelessness, and a series of abusive relationships.

¶ 5        Wilmington Police Detective Carlos Lamberty ("Det. Lamberty") was named the lead investigator on Ms. Tucker's missing person case.  Det. Lamberty patrolled several areas in Wilmington where Ms. Tucker was known to frequent, checked hotels and motels where she had previously stayed, released a department-wide call for information, and solicited tips through local media.  All of these efforts failed to lead to the discovery of Ms. Tucker's whereabouts.

### 2. *The Rippy Disappearance and Investigation*

¶ 6        On 6 April 2014, Roberta Lewis ("Ms. Lewis") went to visit her daughter, Ms. Rippy, for her 54th birthday at her apartment in Wilmington.  When Ms. Rippy did not come to the door, Ms. Lewis left and attempted to contact her daughter by phone over the next several hours.  Ms. Lewis still had not heard from her daughter by the following morning, leading her to contact the Wilmington Police Department.

¶ 7        An officer forcibly entered the apartment in an effort to locate Ms. Rippy, but she was not inside.  Nothing was missing from the apartment other than Ms. Rippy's purse.  Her moped—her only source of transportation due to a revoked driver's license following several DWIs—was still parked outside.  A written missing person report was filed shortly thereafter, and the matter was assigned to Det. Lamberty.

¶ 8        Wilmington police began their investigation into Ms. Rippy's disappearance by obtaining her cellular phone records, which revealed several calls to Defendant on the night before her disappearance. Given these call records, and in light of the fact that Defendant and Ms. Rippy were co-workers at a company called Mott Landscaping, police decided to try and locate Defendant at his home for an interview. Officers conducted their first interview with Defendant on 9 April 2014. He expressed surprise at her disappearance but told police she was severely depressed and had recently expressed suicidal ideations to him. He also told police at a follow-up interview two days later that he had last seen Ms. Rippy on 3 April 2014.

¶ 9        Det. Lamberty, along with fellow Detective Kevin Tully ("Det. Tully"), were able to discern from Ms. Rippy's cellular location data that she had travelled south from a bar in downtown Wilmington on 5 April 2014, the night before her disappearance. Dets. Lamberty and Tully reviewed traffic camera images from that evening and found footage of a truck matching the description of Defendant's vehicle travelling southbound consistent with the cellular location data from Ms. Rippy's phone. Dets. Lamberty and Tully also located surveillance footage from a gas station for the night in question, which showed Defendant buying items inside the station while Ms. Rippy was seated inside his truck.

¶ 10        Having caught Defendant in a lie about his last contact with Ms. Rippy, police obtained and executed a search warrant on Defendant's home and truck. They also

interviewed Defendant again.  Defendant acknowledged that he had been lying and explained that he had actually given her a ride to a nearby business on the night before Ms. Rippy's disappearance.  This statement, too, proved to be untrue, as neither Defendant, his truck, nor Ms. Rippy appeared on the surveillance footage obtained from the business identified by Defendant.  Police continued to press Defendant on these inconsistencies, eventually leading him to say that he had last seen Ms. Rippy on 5 April 2014 when she jumped out of his vehicle near Greenfield Lake while on the phone with Steven Mott ("Mr. Mott"), the owner of Mott Landscaping.  In a later statement, Defendant told police that he knew he was under suspicion "because of other reasons in his past[2] and that . . . he was the last person to see her alive."

Defendant also told detectives that he had taken at least one woman to a vacant lot owned by Mott Landscaping to engage in sexual activity.  Police spent several weeks searching properties owned by and associated with Mott Landscaping for Ms. Rippy without success. Searches of the wooded areas around Defendant's home and Greenfield Lake were likewise unsuccessful.

### 3. The Recovery of Ms. Tucker's Body

---

[2] Defendant was convicted for the first-degree murder of his 11-year-old stepdaughter in 1990.  *See Bradley*, 2018 WL 5796233 at *2-3 (discussing the facts of Defendant's conviction for the murder of his stepdaughter).

¶ 12          Law enforcement continued to comb areas connected to Mott Landscaping and Defendant for Ms. Rippy's body over the ensuing weeks. On 29 April 2014, Wilmington police searched a farm owned by Mr. Mott in Pender County that Defendant was responsible for mowing and clearing. In the course of that search, officers found a naked body inside three black trash bags buried in a shallow grave. The body was found in the fetal position, its legs bound with duct tape. The State Crime Lab's analysis of the duct tape found on the body would later show it to be consistent with duct tape recovered from Defendant's apartment. Bleach and black trash bags were found in a nearby workshop. Though Det. Lamberty originally believed the body to be Ms. Rippy, an autopsy later revealed it to be Ms. Tucker.

### 4. *Investigation Into Ms. Tucker's Murder*

¶ 13          Already arrested for Ms. Rippy's disappearance, Defendant became a suspect in the Tucker investigation, resulting in additional searches of his home and effects for evidence pertinent to that case. Det. Lamberty requested a second search warrant for Defendant's truck and removed the driver's side floormat, carpet, and padding for DNA analysis. Several screening tests for blood returned positive results for portions of the floor padding and carpeting, and additional testing conclusively established the presence of human blood on those items. Samples from the padding and carpeting were also subjected to DNA analysis. Although the portions of the padding and floormat which conclusively tested positive for human blood failed to produce usable

DNA samples, a section of the padding that tested inconclusively for blood tested uniquely positive for Ms. Tucker's DNA.

¶ 14          Police also discovered that a man named Peter Koke ("Mr. Koke"), who had previous dealings with Mr. Mott, Ms. Rippy, and Defendant, was propositioned by Ms. Tucker in July of 2013. When Mr. Koke declined her services, Ms. Tucker entered into a vehicle with Defendant. Mr. Koke had seen Ms. Tucker and Defendant together at other times and, on one occasion, witnessed a shouting match occur between Defendant and Ms. Rippy.

¶ 15          A detective with the Wilmington Police Department also met with a woman named Crystal Sitosky ("Ms. Sitosky") about Defendant's involvement with Mses. Rippy and Tucker. Ms. Sitosky, who struggled with an opioid addiction, first met Defendant in July of 2012 when he began flirting with her outside her probation office. Ms. Sitosky saw Ms. Tucker in Defendant's car during this conversation, which ended when she and Defendant exchanged numbers. Ms. Sitosky later saw Defendant again when she called him after her car was immobilized with a flat tire. She continued to see Defendant periodically because he provided her with money for drugs. Defendant repeatedly expressed a desire to form a romantic relationship with Ms. Sitosky, but she rebuffed his advances each time. She also met with Defendant at both the Mott Landscaping lot where he had engaged with sexual activity with other women and the tract in Pender County where Ms. Tucker's body was found.

Defendant gave Ms. Sitosky a phone at one point, which contained photographs of Ms. Tucker and her children. He also hinted to Ms. Sitosky that he was romantically interested in Ms. Rippy, but that they were not in a relationship.

### 5. *The Trial*

¶ 16    Defendant was indicted for the first-degree murder of Ms. Tucker on 5 December 2016 and was tried beginning 22 January 2019. Prior to trial, the State moved to admit 404(b) evidence of the investigation into Ms. Rippy's disappearance, as well as copies of stories Defendant had written about murderers titled "The Beast Within" and "Serial Killer." Following a *voir dire* hearing, the trial court entered a written order concluding that the circumstances of Ms. Rippy's disappearance were sufficiently similar and proximate to Ms. Tucker's death to be admissible under Rule 404(b) to show: (1) how police came to discover Ms. Tucker's body; (2) identity; (3) motive; and (4) plan, preparation, and *modus operandi* of Defendant. The trial court also ruled the probative value of that evidence was not outweighed by the danger of unfair prejudice, and that a limiting instruction would be given to the jury. The trial court further ruled that Defendant's short stories were more prejudicial than probative and therefore inadmissible under Rule 403.

¶ 17    At trial, 23 witnesses testified consistent with the above recitation of the facts. The State elicited additional testimony that police recovered a "Rug Doctor" carpet cleaner from Defendant's apartment, that Defendant had washed his truck several

times since the disappearances of Mses. Tucker and Rippy, and that the inability to recover DNA from the conclusive human blood samples on the truck carpeting and padding may have been caused by the use of chemical cleaners. Defendant moved to dismiss the first-degree murder charge at the close of evidence. The trial court denied Defendant's motion.

### 6. *Closing Arguments*

¶ 18    Following the presentation of evidence, the prosecutor began his closing argument by opining about notions of good and evil, telling the jury that the love between parents and children is good, but "just as there is good and beauty in the world, there's also evil. And you don't need a law degree to know what [the killing of Ms. Tucker] is. This, ladies and gentlemen, is pure evil." He then asserted that while there were some differences between Mses. Rippy and Tucker, they both shared a common connection to Defendant. Defendant's counsel objected, arguing that the evidence of Ms. Rippy's disappearance was introduced for limited purposes, and that this argument was outside the scope of the trial court's prior ruling. The trial court overruled the objection, and the prosecutor continued, emphasizing that the limited purposes for which evidence around Ms. Rippy's disappearance was introduced was to show "the identity of the killer. It goes to motive, is there a plan, is there a modus operandi."

¶ 19        Later in closing, the prosecutor stated that "[y]ou know, sometimes evil wears a mask. Sometimes you have to dip below the surface. Sometimes evil is readily apparent, like when you're looking at the grotesque deformities on the body of [Ms. Waldron]'s baby [Ms. Tucker]. But, no, when you're looking at this defendant, you have to dip below the surface." At another point, the prosecutor asked the jury, "[i]s [Ms. Rippy] in the belly of an alligator in Greenfield Lake? . . . Is she in the belly of that pig out on Hoover Road? Is she in a hole somewhere? . . . How does it end? Her life is over. We just haven't found the body for a funeral yet." Defendant objected and moved to strike on the ground that any suggestion Ms. Rippy was dead was outside the scope of the earlier Rule 404(b) ruling by the trial court. Following a hearing outside the presence of the jury, the trial court overruled Defendant's objection and allowed the prosecutor to continue. The prosecutor resumed argument by saying "Shannon Rippy is gone too, but she's not forgotten. She's dead, but we'll never stop looking." Defendant objected again and was overruled.

¶ 20        The prosecutor's closing also referenced the DNA evidence tested by the State Crime Lab, contending that Ms. Tucker's blood was found in Defendant's truck. Defendant objected and moved to strike the argument but was overruled. Later, the prosecutor offered that "there's actually only five ways to defend any case," and began explaining why no defense could disprove Defendant's guilt. Defendant objected, moved for a mistrial, and moved to strike. The trial court sustained that objection

and allowed the motion to strike, though it ultimately denied the motion for mistrial. It then gave a curative instruction that the Defendant is presumed innocent, the prosecutor's argument must be disregarded, and that Defendant has no burden in a criminal prosecution. The prosecutor resumed his argument by reiterating that "the only burden of proof in this case is on [the State]. . . . There's no burden on the defense attorneys, to be clear."

¶ 21        Finally, in a later segment of closing argument, the prosecutor argued to the jury that Defendant could not contend both that he was innocent or at most guilty of second-degree murder, as each position contradicted the other. Defendant objected and moved for a mistrial on the basis that the prosecutor's argument suggested Defendant was responsible for the lesser-included second-degree murder charge on the verdict sheet. The trial court reviewed the transcript of arguments, concluded that the State had not made such a suggestion, and denied the motion for mistrial. It did, however, sustain Defendant's objection and give a curative instruction that the verdict sheet was prepared by the court and not the parties.

### 7. *Conviction and Appeal*

¶ 22        After two-and-a-half hours of deliberations, the jury found Defendant guilty of first-degree murder. The trial then proceeded to the sentencing phase, and the prosecutor urged the jury to impose the death penalty based on Defendant's two prior first-degree murder convictions and the heinous, atrocious, or cruel nature of Ms.

Tucker's murder. The jury was unable to reach a unanimous recommendation. The trial court then imposed a sentence of life without parole. Defendant gave notice of appeal in open court.

## II.   ANALYSIS

¶ 23    Defendant asserts the trial court prejudicially erred in: (1) admitting substantial evidence of the investigation into Ms. Rippy's disappearance under Rules 404(b) and 403 of the North Carolina Rules of Evidence; (2) failing to properly address allegedly improper closing arguments by the State; and (3) denying his motion to dismiss the first-degree murder charge for insufficient evidence of premeditation and deliberation.    Defendant further asserts that all of the foregoing errors, if insufficiently prejudicial standing alone, were so cumulatively prejudicial as to warrant a new trial. We address each argument in turn.

### 1. *Evidence of Ms. Rippy's Disappearance Under Rules 404(b) and 403*

¶ 24    Defendant first contends that the evidence of Ms. Rippy's disappearance was: (1) not sufficiently similar to be admitted under Rule 404(b); and (2) was so voluminous as to be more prejudicial than probative under Rule 403. Defendant requests plain error review in the event trial counsel failed to timely object to the challenged evidence.

### a. *Preservation*

¶ 25    Our appellate rules provide that, "[i]n order to preserve an issue for appellate

review, a party must have presented to the trial court a timely request, objection, or motion . . . ." N.C. R. App. P 10(a)(1) (2021). Our Supreme Court has held that "[t]o be timely, an objection to the admission of evidence must be made at the time it is actually introduced at trial." *State v. Ray*, 364 N.C. 272, 277, 697 S.E.2d 319, 322 (2010) (citation and quotation marks omitted). It is therefore insufficient to rely on objections lodged pre-trial or outside the presence of the jury. *Id.* Nor is it adequate to lodge an objection after similar evidence has previously been admitted without protest, as "the admission of evidence without objection waives prior or subsequent objection to the admission of evidence of a similar character." *State v. Hudson*, 331 N.C. 122, 151, 415 S.E.2d 732, 747–48 (1992) (citation and quotation marks omitted).

¶ 26    Here, Defendant conceded prior to trial that some evidence of Ms. Rippy's disappearance was admissible under Rule 404(b) to show how police came to discover Ms. Tucker's body. Several witnesses testified at trial about Ms. Rippy without any objection by Defendant under Rules 404(b) and 403. Defendant first objected based on Rule 404(b) during Det. Lamberty's testimony—well after other witnesses, including Ms. Rippy's mother and other police officers, had testified on the same subjects and to substantially identical facts. Because Defendant did not lodge a timely objection to the evidence of Ms. Rippy's disappearance that he now challenges on appeal, he has failed to preserve his Rule 404(b) and 403 arguments for prejudicial error review. *Ray,* 264 N.C. at 277, 697 S.E.2d at 322; *Hudson*, 331 N.C. at 151, 415

S.E.2d at 747–48.

¶ 27    Though Defendant failed to preserve his evidentiary arguments, his principal brief seeks plain error review of these issues. We review this portion of his appeal under that standard. *See* N.C. R. App. P. 10(a)(4) (2021) ("In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved . . . nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.").[3]

### b. *Plain Error Review*

¶ 28    In order to demonstrate plain error, a defendant must "show that error occurred and the error 'had a probable impact on the jury's finding of guilty.' " *State v. Doisey*, 138 N.C. App. 620, 625, 532 S.E.2d 240, 244 (2000) (quoting *State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 379 (1983)). The error cannot be merely "obvious or apparent," *Odom*, 307 N.C. at 660, 300 S.E.2d at 378, and instead must be a

---

[3] In its brief, the State suggests that plain error review is entirely unavailable because "Defendant fails to show exceptional circumstances warranting plain error review." This statement inverts our application of the plain error standard; we will conduct plain error review when "specifically and distinctly contended" in a defendant's principal brief, N.C. R. App. P. 10(a)(4), but we will only hold plain error exists following that review upon a showing by the defendant that his is an "exceptional case." *State v. Maddux*, 371 N.C. 558, 564, 819 S.E.2d 367, 371 (2018) (citation and quotation marks omitted). *Cf. State v. Patterson*, 269 N.C. App. 640, 645, 839 S.E.2d 68, 72 (2020) (dismissing a defendant's appeal under plain error review when he failed to argue "why the alleged error rises to plain error" and thus precluded "any meaningful review for plain error").

"*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *Id.* (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982)) (emphasis in original).

  c.  *Standards of Review for 404(b) and 403 Error*

¶ 29    We apply two different standards of review to discern whether the trial court erred under Rules 404(b) and 403. As explained by our Supreme Court:

> When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling, as it did here, we look to whether the evidence supports the findings and whether the findings support the conclusions. We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion.

*State v. Beckelheimer*, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012).

  d.  *The Trial Court Did Not Err Under 404(b)*

¶ 30    Rule 404(b) is a "rule of *inclusion* of relevant evidence or other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278–79, 389 S.E.2d 48, 54 (1990) (emphasis in original).

¶ 31    The rule itself expressly identifies several purposes for which evidence may be admitted, including to show "motive, opportunity, intent, preparation, plan, . . . [or]

identity." N.C. R. Evid. 404(b). Because this list "is not exclusive," *State v. White*, 340 N.C. 264, 284, 457 S.E.2d 841, 852 (1995), evidence is admissible under the Rule to show, among other things, "the chain of circumstances or context of the charged crime . . . if the evidence of other crimes serves to enhance the natural development of the facts or is necessary to complete the story of the charged crime for the jury." *Id.* at 284, 457 S.E.2d at 853.

¶ 32 Evidence offered for a proper purpose under Rule 404(b) must adhere to "the requirements of similarity and temporal proximity." *State v. Al-Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 123 (2002) (citations omitted). The crime charged and the evidence in question need not "rise to the level of the unique and bizarre," *State v. Green*, 321 N.C. 594, 604, 365 S.E.2d 587, 593 (1988), though there must be "some unusual facts present in both crimes that would indicate that the same person committed them." *Beckelheimer*, 366 N.C. at 131, 726 S.E.2d at 159 (citation and quotation marks omitted). In discerning whether the 404(b) evidence was properly admitted, we examine the similarities identified by the trial court rather than the differences between the crime charged and the proffered evidence. *State v. Wilson-Angeles*, 251 N.C. App. 886, 893, 795 S.E.2d 657, 664 (2017) (citations omitted).

¶ 33 The trial court entered a written order with findings of fact and conclusions of law in support of its decision to admit evidence of Ms. Rippy's disappearance under Rule 404(b). The trial court's findings of fact—none challenged on appeal—include

the following:

> 16. . . . [B]oth Rippy and Tucker struggled with substance abuse issues.
>
> 17. . . . [B]oth Rippy and Tucker had limited financial resources.
>
> 18. . . . [B]oth Rippy and Tucker sometimes relied on the Defendant for transportation.
>
> 19. . . . [B]oth Rippy and Tucker had criminal convictions connected to their substance abuse issues.
>
> 20. . . . Defendant was romantically interested in both Rippy and Tucker and worked to gain their trust and confidence through sustained relationships.

¶ 34    The trial court made additional findings demonstrating how the Rippy and Tucker investigations were temporally and factually interrelated: (1) the disappearances occurred nine months apart at most; (2) police searched the Mott property where Ms. Tucker's body was found because Defendant and Ms. Rippy both worked for Mott Landscaping and Defendant was a suspect in Ms. Rippy's disappearance; (3) police initially believed the body found on the Mott property was Ms. Rippy; (4) Defendant was arrested for Ms. Rippy's murder on the day Ms. Tucker's body was found; and (5) Defendant told police that he had cleaned his car several times after Ms. Rippy had disappeared, and "the forensic evidence that placed Tucker's DNA inside the Defendant's Tahoe was barely visible and appears to have been degraded by some sort of chemical substance which would be consistent with

efforts by the Defendant to clean the vehicle."

¶ 35        The trial court concluded based on its findings that evidence of Ms. Rippy's disappearance and the ensuing investigation was "essential [to] help provide a complete story to the jury," and also admissible to prove Defendant's identity, motive, intent, premeditation, deliberation, plan, preparation, and modus operandi.  The trial court further concluded that the disappearances were "temporally proximate," and their circumstances were "similar in nature."

¶ 36        We hold that the trial court did not err in admitting the challenged evidence.

¶ 37        Defendant does not argue that the evidence was admitted for improper purposes; instead, he asserts that "the only information necessary to complete the story [of Ms. Tucker's death] was testimony about why detectives were on the property where Tucker's body was found," and the "superficial similarities" between Mses. Rippy and Tucker were inadequate to satisfy the Rule's similarity requirements.

¶ 38        Contrary to Defendant's contention, it was not possible to provide a natural and complete development of the facts without testimony concerning Ms. Rippy's disappearance and the police investigation that followed, leading to the discovery of Ms. Tucker's body.   The disappearances and investigations are "inextricably

intertwined," *White*, 340 N.C. at 286, 457 S.E.2d at 853.[4]

¶ 39        Simply telling the jury that detectives were searching for a missing person at the Mott property would not offer an adequate picture of Defendant's connection to that missing person. The evidence was necessary to establish the weight and probative value of the State's other evidence. For example, Mr. Mott—who was initially a suspect in Ms. Rippy's disappearance and who testified that Defendant was solely responsible for maintaining the tract of land where Ms. Tucker's body was found—told the jury that he never met Ms. Tucker and knew nothing about her murder. If jurors heard nothing about Ms. Rippy and Defendant's apparent involvement in her disappearance, they would rightly wonder whether Mr. Mott's testimony was truthful given: (1) Ms. Tucker's dismembered body was found on his land; and (2) his property was already being searched for a different missing woman. *Cf. State v. Washington*, ___ N.C. App. ___, ___, 2021-NCCOA-219, ¶ 21 (holding 404(b) evidence of a prior theft of a handgun used to commit a murder was admissible in the murder trial in part because it "explained why the legal gun owner was not

---

[4] We note that practically every witness had some connection to both investigations. The detectives who testified, including Det. Lamberty, handled both cases. Ms. Sitosky came forward to report her knowledge of the relationship between Defendant and Ms. Tucker because she saw a letter from Ms. Rippy's mother about her missing daughter in the local newspaper. Mr. Mott, originally a person of interest in the Rippy investigation, owned the property where Ms. Tucker's body was found but was also Ms. Rippy's employer and on-and-off-again boyfriend. Mr. Koke, who was propositioned by Ms. Tucker and saw her with Defendant, had prior dealings with Defendant and Ms. Rippy.

considered a suspect and showed the thoroughness of law enforcement's investigation").

¶ 40    The investigation of Ms. Rippy's disappearance likewise bears upon Ms. Sitosky's credibility. She testified that she had seen Defendant and Ms. Tucker together on numerous occasions but only reported this information to police because she "had read in the newspaper about [Defendant] being arrested, [and] [Ms. Rippy]'s mom had wr[itten] a letter to the newspaper in response to, you know, her daughter missing, and it touched my heart. . . . I almost felt like I had to say something or do something. . . . I wanted to be helpful." Defendant's suspected involvement in the disappearance of Ms. Rippy demonstrated why Ms. Sitosky came forward to police. *See White*, 340 N.C. at 285–86, 457 S.E.2d at 853 (holding evidence was admissible under Rule 404(b) to show context in an intertwined case because it was necessary "to assess [the witness's] credibility or what weight to give his testimony").

¶ 41    The evidence uncovered in the investigation of Ms. Rippy's disappearance also cast the State's physical evidence in a more probative light. Police found human blood present on the carpeting of Defendant's truck, but the blood samples failed to produce identifiable DNA. The inverse was true of the padding beneath the carpet, with analysis verifying the presence of Ms. Tucker's DNA, but the lab was unable to confirm human blood as the source. Police also uncovered evidence that Defendant kept carpet cleaners in his home and bleach at the workshop on the Mott property

where Ms. Tucker's body was found. While these two facts alone are not incriminating, it takes on probative value alongside: (1) testimony that Defendant admitted to cleaning his vehicle *during the investigation of Ms. Rippy's disappearance*; and (2) expert testimony that chemical cleaners may have caused the deterioration of the samples found in Defendant's car. In short, the investigation into Ms. Rippy's disappearance is inseparable from Ms. Tucker's murder. The trial court did not err in allowing this evidence to "enhance the natural development of the facts" because it was "necessary to complete the story of the charged crime for the jury." *Id.* (citations omitted).

¶ 42    We also disagree with Defendant's characterization of the similarities between Mses. Rippy and Tucker as "superficial." He relies on our decision in *State v. Gray*, 210 N.C. App. 493, 512, 709 S.E.2d 477, 490 (2011), for the proposition that the similarities between the two women were so generic as to be inconsequential. But the similarities noted by the trial court in this case are more numerous and probative than those found inadequate in *Gray*. In that case, the alleged 404(b) victim and the alleged victim in the crime charged were of different sexes, in different states, and victims of different sex acts, with the only similarities being their youth and that the defendant had access to both through social relationships. 210 N.C. App. at 512–13, 709 S.E.2d at 490–91.

¶ 43    Here, by contrast, both victims: (1) were residents of the Wilmington area; (2)

were of the same sex; (3) disappeared within nine months of each other at most, prompting missing persons reports from their mothers; (4) had legal, financial, and substance abuse problems, facts particularly pertinent given Ms. Sitosky's testimony that Defendant supplied her with money under like circumstances; (5) relied on Defendant for transportation; (6) had "sustained relationships" with Defendant; and (7) were subjects of his sexual attention. The similarities noted by the trial court were sufficient to warrant admission of evidence about Ms. Rippy under Rule 404(b). *See State v. Hembree*, 368 N.C. 2, 12, 770 S.E.2d 77, 84–85 (2015) (holding evidence of uncharged murder was sufficiently similar under Rule 404(b) when the trial court found both female victims were murdered, white, prostitutes, drug users, located in the same county, and acquaintances and sexual partners of the defendant).

### e. *The Trial Court Did Not Err Under Rule 403*

¶ 44     Defendant argues the trial court abused its discretion in concluding the evidence of Ms. Rippy's disappearance was more probative than prejudicial under Rule 403, relying principally on *Hembree*. Because *Hembree* is distinguishable and the trial court appears to have carefully considered potential prejudice, we hold the Defendant has failed to show the trial court abused its discretion in this ruling.

¶ 45     In *Hembree*, the bodies of two murdered women were discovered independently in South Carolina; one was left half-naked in a culvert, while the other was found burned along a dirt road. 368 N.C. at 4, 770 S.E.2d at 80. The defendant—who at

one point confessed to murdering both women in North Carolina before disposing of them across the border—was tried for the murder of the half-naked woman. *Id.* Prior to trial, the State moved to introduce evidence of the burned woman's murder under Rule 404(b). 368 N.C. at 6, 770 S.E.2d at 81. The trial court admitted that evidence under Rules 404(b) and 403, concluding it showed a common plan or scheme and was more probative than prejudicial. *Id.* Once trial commenced, however, the State focused primarily on the death of the burned woman, introducing at least sixteen graphic photographs of the burned body and testimony from a witness describing what the burned body felt like to touch. *Id.* at 6–7, 770 S.E.2d at 81–82. The State also introduced evidence of the cause of death for both women; while there was some evidence that the half-naked woman had died an accidental death by cocaine overdose, the State's evidence that the burned woman had died by strangulation was "more certain." *Id.* at 7, 770 S.E.2d at 82. In fact, on the whole, "there was more evidence presented concerning the [burned woman's] murder than there was for the murder" actually being tried. *Id.*, 770 S.E.2d at 81 (quotation marks omitted). Defendant was convicted of the half-naked woman's murder, sentenced to death, and appealed. *Id.* at 9, 770 S.E.2d at 83.

On appeal, our Supreme Court held that the trial court erred in admitting the evidence of the burned woman's death. *Id.* at 16, 770 S.E.2d at 87. The Court reached that result based for four reasons: (1) the central issue at trial was the victim's

unclear cause of death, and the certainty provided by the evidence that the burned woman was strangled "likely weighed heavily in the jury's deliberations[;]" (2) the State introduced testimony from a witness who described what it felt like to touch the burned body alongside more than a dozen "stark and unsettling" photographs of the charred remains; (3) evidence of the burned body focused on the differences between the two deaths "rather than a similarity as anticipated under Rule 404(b)[;]" and (4) "the lack of an obvious connection between the offenses" rendered the 404(b) evidence less probative than in other cases. *Id.* at 14–16, 770 S.E.2d at 86–87. Thus, because the victim's "cause of death was uncertain, and the Rule 404(b) evidence was so emotionally charged," our Supreme Court held the trial court erred by admitting:

> an excessive amount of evidence about [the burned woman], particularly photographic evidence, when the probative value of the sum total of that evidence was substantially outweighed by the risks that it would confuse the issues before the jury, or lead the jury to convict based on evidence of a crime not actually before it.

*Id.* at 16, 770 S.E.2d at 87.

¶ 47    *Hembree* is distinguishable from this case. First, unlike in *Hembree*,[5] there is an obvious connection between the disappearances of Mses. Rippy and Tucker, as

---

[5] We note that in *Hembree*, the Supreme Court surveyed instructive cases from other jurisdictions and found *Flowers v. State*, 773 So.2d 309 (Miss. 2000), in which evidence of three other murders was admitted in the trial of a fourth murder, most similar. It then quoted a lengthy excerpt from *Flowers*, including the following language: "It is the 'necessity'

revealed by the two police investigations that became intertwined.  Second, this case did not involve 404(b) evidence in the form of highly inflammatory and gruesome photographs of Ms. Rippy that ran the risk of inflaming the jury's passions; the only graphic images the jury saw were those of Ms. Tucker's dismembered body.  Third, the evidence did not serve to highlight the differences between Mses. Rippy and Tucker.  Instead, the evidence admitted demonstrated how Defendant targeted both women pursuant to a common plan or scheme.  Lastly, there was substantial evidence beyond Ms. Rippy's disappearance introduced by the State, including the testimonies of Ms. Sitosky and Mr. Koke linking Defendant to Ms. Tucker, the discovery of Ms. Tucker's body at a location Defendant was responsible for clearing and maintaining, the presence of Ms. Tucker's DNA alongside human blood on the flooring of Defendant's car, and the recovery of duct tape from Defendant's home consistent with tape used to bind Ms. Tucker's body.  Given these distinctions, *Hembree* is inapposite.

¶ 48        The trial court's deliberate and discretionary weighing of potential unfair prejudice against the evidence's probative value is also pertinent to our analysis.  In its order, the trial court excluded evidence of Defendant's short stories about serial killers as more prejudicial than probative under Rule 403, "indicating [its] careful

---

by the State to use the other evidence of three killings in order to tell a coherent story that is the key to its admissibility.  *The case at bar is not one of those cases so interconnected that mention of the other three murders is necessary to tell the whole story.*"  *Hembree*, 368 N.C. at 15, 770 S.E.2d at 86 (quoting *Flowers*, 773 So.2d at 324) (emphasis added).

consideration of the evidence." *Beckelheimer*, 366 N.C. at 133, 726 S.E.2d at 161. The order further discloses that the trial court conducted this analysis as to the 404(b) evidence that was admitted, concluding "[t]hat the danger of unfair prejudice does not substantially outweigh the relevance of this evidence to the disappearance of Rippy in connection with the current trial for Tucker's murder." And the trial court admitted 404(b) evidence with an appropriate limiting instruction. We cannot say that the trial court abused its discretion under Rule 403 given the factors above. *See Beckelheimer*, 366 N.C. at 133, 726 S.E.2d at 161 (holding no abuse of discretion in the admission of Rule 404(b) evidence under Rule 403 for these reasons).

### 2. *Closing Arguments*

¶ 49      Defendant next contends that the trial court erred at closing argument in: (1) allowing the prosecutor to argue Ms. Tucker's blood was found in Defendant's car over Defendant's objection; (2) allowing the prosecutor to rely on 404(b) evidence of Ms. Rippy's disappearance for purposes outside those for which it was admitted; (3) denying Defendant's mistrial motion when the prosecutor's argument impermissibly shifted the burden of proof of guilt to the defense; (4) denying Defendant's mistrial motion after the prosecutor suggested the presence of second-degree murder on the verdict sheet meant Defendant had invited such a conviction; and, (5) failing to intervene *ex mero motu* after the prosecutor argued his personal opinions to the jury. After review of the record under the mandated highly deferential standards of review,

we hold that Defendant has failed to show prejudicial error individually or collectively.

### a. Standards of Review

¶ 50      A trial court's ruling on defendant's objection to closing argument is reviewed for abuse of discretion. *State v. Lopez*, 363 N.C. 535, 538, 681 S.E.2d 272, 273 (2009) (citing *State v. Jones*, 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002)). So, too, is a trial court's denial of a motion for mistrial. *State v. Williams*, 7 N.C. App. 51, 52, 171 S.E.2d 39 (1969). We will hold the trial court abused its discretion only when its ruling "could not have been the result of a reasoned decision." *Jones*, 355 N.C. at 131, 558 S.E.2d at 106 (citation and quotation marks omitted). Application of this standard in the context of closing arguments requires us to "first determine[] if the remarks were improper. . . . Next, we determine if the remarks were of such magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court." *Id.* Prejudice is identified by "assess[ing] the likely impact of any improper argument in the context of the entire closing," *State v. Copley*, 374 N.C. 224, 230, 839 S.E.2d 726, 730 (2020) (citations omitted), and by "look[ing] to the evidence presented by the State to determine whether there is a reasonable possibility the jury would have acquitted defendant if the prosecutor's remarks had been excluded." *Id.* at 231, 839 S.E.2d at 730 (citations omitted).

¶ 51    Closing arguments that fail to garner an objection when made are reviewed to determine whether the "remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mere motu*." *Jones*, 355 N.C. at 133, 558 S.E.2d at 107. To show gross impropriety, a defendant must demonstrate that "the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Rose*, 339 N.C. 172, 202, 451 S.E.2d 211, 229 (1994) (citations and quotation marks omitted). "[O]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693 (1996).

¶ 52    Both the trial court and the prosecutor enjoy significant leeway at closing argument. *See State v. Cummings*, 361 N.C. 438, 465, 648 S.E.2d 788, 804 (2007) ("[T]he trial court has broad discretion to control the scope of closing arguments." (citations omitted)); *State v. Flowers*, 347 N.C. 1, 36, 489 S.E.2d 391, 411 (1997) ("[P]rosecutors are given wide latitude in the scope of their argument." (citation omitted)). A prosecutor may therefore "argue to the jury the law, the facts in evidence and all reasonable inferences drawn therefrom," *Flowers,* 347 N.C. at 36–37, 489 S.E.2d at 412 (citation omitted), but is prohibited from "plac[ing] before the jury

incompetent and prejudicial matters by injecting his own knowledge, beliefs, and personal opinions not supported by the evidence." *Id.* at 36, 489 S.E.2d at 412 (citation and quotation marks omitted). In discerning whether the prosecutor's remarks were improper, "we must give consideration to the context in which the remarks were made and the overall factual circumstances to which they referred." *State v. Thompson*, 359 N.C. 77, 110, 604 S.E.2d 850, 873 (2004) (citation and quotation marks omitted).

      *b. Statements About Ms. Tucker's Blood*

The prosecutor repeatedly argued during closing that Ms. Tucker's blood was present in Defendant's car, and Defendant objected to these statements numerous times. The trial court overruled these objections each time.

A prosecutor may argue any reasonable inferences from the evidence introduced at trial. *State v. Boyd*, 214 N.C. App. 294, 305–06, 714 S.E.2d 466, 475 (2011). Here, the State introduced expert testimony and lab results showing the conclusive presence of human blood on sections of carpeting and padding of the driver's seat flooring in Defendant's car, though no DNA samples were recoverable from those sections. Other evidence produced opposite results, as Ms. Tucker's DNA was found on a section of the floor padding that returned inconclusive (but not negative) results for human blood. The State's experts testified that these discrepancies may well have been the result of chemical cleaners, and other evidence

showed Defendant had: (1) cleaned his car several times after Ms. Tucker disappeared; and (2) had bleach in his workshop and carpet cleaners in his home. Finally, the section of flooring containing Ms. Tucker's DNA does not appear prone to incidental contact with other sources of DNA, as it was located beneath both a rubber floormat and a layer of carpeting below the driver's seat. All of this evidence leads to a reasonable inference that the DNA—found alongside sections testing positive for human blood—was sourced from Ms. Tucker's blood. For these reasons, we hold the trial court did not err in overruling Defendant's objections to this portion of closing argument.

### c. *Statements About Ms. Rippy's Death*

¶ 55 Defendant also argues that the trial court erred in allowing the prosecutor, over Defendant's objections, to argue that Ms. Rippy was dead during closing arguments. Defendant takes specific issue with the prosecutor's statements in light of the trial court's admonition, made during the pre-trial 404(b) motion hearing, that it "want[ed] to make sure that there's no intention of the State ever going in with any witness and to ever discussing the death of Ms. Rippy Van Newkirk. It would just be, again, as to her disappearance."

¶ 56 Despite Defendant's argument to the contrary, the trial court's evidentiary rulings did not preclude the State from arguing in closing that Ms. Rippy was deceased. The State introduced testimony, without objection, that the Wilmington

Police Department changed the internal designation of Ms. Rippy's investigation from a missing persons case to murder. Later, when Defendant requested the written internal report reflecting this new designation be redacted once in evidence, the State made clear its intention to argue to the jury that Ms. Rippy was dead:

> [W]e're not saying that he's been convicted of that murder, which we all know in this room; but that's far different that saying that it's now termed a murder by WPD, which it is the second that he's arrested for it, which is the standard business practice of the WPD.
>
> . . . [W]e are not embracing the fact that Ms. [Rippy] might be in Tahiti right now. She's dead, and he did it. We're not saying he did it in front of this jury . . . . But we're not running from the fact that she's dead, and I intend to argue that she's dead in my closing argument.

The trial court then denied Defendant's motion, noting that the State had not sought to elicit any evidence of Defendant's conviction for Ms. Rippy's murder. Based on this evidentiary ruling made at trial,[6] and given the trial court permitted the State to argue Ms. Rippy was dead over Defendant's objection, it appears the trial court only limited evidence of Defendant's *conviction* for Ms. Rippy's murder and did not intend to bar evidence suggesting—or arguments asserting—that she was dead.

---

[6] We note that pre-trial rulings on the admissibility of evidence are preliminary, and the trial court's final determination is made at the time evidence is introduced. *See State v. Hill*, 347 N.C. 275, 293, 493 S.E.2d 264, 274 (1997) ("Rulings on these motions . . . are merely preliminary and subject to change during the course of trial, depending upon the actual evidence offered at trial . . . ." (citation and quotation marks omitted)).

¶ 57     Again, a prosecutor may argue "all the facts in evidence as well as any reasonable inferences that may be drawn from those facts," *State v. Riley*, 137 N.C. App. 403, 413, 528 S.E.2d 590, 597 (2000), and it is reasonable to infer from the evidence presented that Ms. Rippy is deceased.  The State introduced testimony that: (1) Defendant volunteered in a police interview that he "was the last person to see [Ms. Rippy] alive," suggesting he believed Ms. Rippy could be dead; (2) the Wilmington Police Department reclassified Ms. Rippy's case from a missing persons investigation to first-degree murder; and (3) no one had located Ms. Rippy or her body after five years of continuing criminal and volunteer investigations into her whereabouts.[7]   Given this testimony, the trial court did not err in denying Defendant's objection to the prosecutor's argument that Ms. Rippy is dead based on a reasonable inference from the evidence presented.

¶ 58     Nor does it appear the prosecutor referenced the death of Ms. Rippy for an improper purpose.  Instead, the prosecutor used that inference to downplay Defendant's anticipated attempts "to say that there's a lot of differences between

---

[7] Although North Carolina law governing the estates of missing persons has abolished the common law presumption of death based on absence, N.C. Gen. Stat. § 28C-1 (2019), we note that the modern trend amongst jurisdictions is to recognize a presumption of death after five years. *See* Am. Jur. 2d Death § 399 (2021) (noting that the Uniform Probate Code provides for a presumption of death after five years' absence and is now "followed in several jurisdictions").  The State commenced closing arguments in this case ten days prior to the five-year anniversary of Ms. Rippy's disappearance.

these women" and to emphasize an additional similarity between them to show "who's the identity of the killer, [Ms. Tucker's] killer. It goes to is there a motive, is there a plan, is there a modus operandi." Later, the prosecutor argued "I want to be very clear, I am not asking that you punish him for [Ms. Rippy's] case today. In fact, that is absolutely an impermissible use. Instead, what it does is it goes to modus operandi." The remaining mentions of Ms. Rippy's death likewise show the inference was drawn for the jury for these permissible purposes. Read in context, alongside the trial court's specific instruction to the jury that evidence of Ms. Rippy's disappearance could only be used for the limited permissible purposes outlined above, we hold that Defendant has failed to demonstrate any abuse of the trial court's wide discretion in overruling his objections to these statements by the prosecutor. *See, e.g.*, *State v. Murillo*, 349 N.C. 573, 603–4, 509 S.E.2d 752, 770 (1998) (holding prosecutor's argument that the defendant—an expert marksman who was previously convicted for involuntary manslaughter in shooting of his first wife and was now on trial for first-degree murder in the shooting death of his fourth wife—likely did not accidentally shoot both wives was not improper when it was a reasonable inference from the evidence and was argued for a proper 404(b) purpose).

### d. *Prosecutor's Burden-Shifting and Verdict Sheet Comments*

Defendant next asserts that the trial court erred in denying his motion for a mistrial after it sustained Defendant's objections to comments from the prosecutor

that suggested Defendant: (1) bore the burden of proving his own innocence; and (2) was responsible for the inclusion of second-degree murder as a lesser-included offense on the verdict sheet. Defendant's counsel immediately objected to the comments, the trial court sustained the objections after hearing arguments outside the presence of the jury, and the trial court gave curative instructions to the jury once closing's statements resumed. Defendant asserts on appeal that the curative instructions were inadequate; our precedents, however, lead us to hold otherwise.

¶ 60    Our Supreme Court has held that "[w]here, immediately upon a defendant's objection to an improper remark made by the prosecutor in his closing argument, the trial court instructs the jury to disregard the offending statement, the impropriety is cured." *State v. Woods*, 307 N.C. 213, 222, 297 S.E.2d 574, 579 (1982) (citations omitted). We have applied this rule to hold that any prejudice in a prosecutor's closing argument was cured when the defendant timely objected, the court held a bench conference to resolve the objection, and the trial judge issued a curative instruction once proceedings resumed. *State v. Peterson*, 179 N.C. App. 437, 468–69, 634 S.E.2d 594, 617 (2006). Our Supreme Court has noted such curative instructions may serve to alleviate prejudice even when the record shows the instruction was both incomplete and somewhat untimely. *See State v. Barden*, 356 N.C. 316, 381–82, 572 S.E.2d 108, 149 (2002) (declining to hold a delayed, incomplete, and ambiguous instruction was ineffective "because a jury is presumed to follow a court's

instructions" (citation omitted)).  The curative instructions provided in this case fall within the holdings in *Woods*, *Barden*, and *Peterson*.  The trial court did not err in denying Defendant's motions for mistrial under these circumstances.

e. *Statements of Personal Opinion*

¶ 61   Defendant further argues that the trial court erred in not intervening *ex mero motu* to the comments by the prosecutor about "evil."  Those statements, in the context of the prosecutor's larger argument, are as follows:

> The world is a beautiful place and there is good in it. . . . We know that there's good in the world because [our children] are born innocent and playful.
>
> . . . .
>
> But, you know, the job of a parent, of course, is to keep our children from harm.  And just as there is good and beauty in the world, *there's also evil*.  And you don't need a law degree to know what this is.  *This, ladies and gentlemen, is pure evil.*
>
> I'm not going to show you the contents of inside that bag. You've seen it.  Suffice it to say, it's heinous, it's brutal, it's a lonely way to die.
>
> . . . .
>
> The world is a beautiful place.  . . . *You know, sometimes evil wears a mask.*  Sometimes you have to dip below the surface.  *Sometimes evil is readily apparent*, like when you're looking at *the grotesque deformities on the body of Rose's baby [Ms. Tucker].  But, no, when you're looking at this defendant, you have to dip below the surface.*

(Emphasis added). Defendant asserts that these comments were particularly improper because the prosecutor displayed a posterboard to the jury with a picture of Defendant—who is Black—alongside images of Mses. Tucker, Sitosky, and Rippy— all of whom are white.

¶ 62     Presuming, *arguendo*, the prosecutor's statements were referring to Defendant—rather than the murder of Ms. Tucker—as evil, such derogatory comments do not rise to the level of gross impropriety requiring the trial court's intervention *ex mero motu*. *See State v. Larrimore*, 340 N.C. 119, 163, 456 S.E.2d 789, 812–13 (1995) (holding prosecutor's statements that the defendant was "*the ultimate*[,] . . . *the quintessential evil*" and "*one of the most dangerous men in this State*" were not grossly improper (emphasis in original)). The trial court gave Defendant an opportunity to review the posterboard before it was shown to the jury, and Defendant's counsel told the court that "we don't have any objection to—to what [the prosecutor] is going to introduce." Additionally, the jury was already well aware of the races of Defendant and Mses. Tucker, Sitosky, and Rippy without the use of the State's visual aid; Defendant was present in the courtroom for trial, Ms. Sitosky testified before the jury, and the State introduced photographs of Mses. Tucker and Rippy into evidence and published them to the jury. Finally, the prosecutor never drew attention to or referenced the races of Defendant or the three women in closing. While we are cognizant of racial bias, we do not see any gross impropriety in the

prosecutor's conduct given that: (1) Defendant did not object to the prosecutor's comments about evil or the use of the posterboard; (2) neither the prosecutor nor the posterboard commented on race; (3) the posterboard did not implicate race beyond the inclusion of photographs of persons the jury had already observed over the several days of trial; and (4) Defendant points to no caselaw where gross impropriety has been found on this theory. As such, we decline to hold that the trial court erred in failing to intervene *ex mero motu.*

### f. *Cumulative Prejudice in Closing Argument*

¶ 63        Defendant concludes his discussion of closing arguments by asserting that the cumulative effect of the alleged improper remarks is so prejudicial as to warrant a new trial. Having held that Defendant has not shown error in the trial court's actions during closing argument, we further hold that Defendant cannot show error through cumulative prejudice.

### 3. *Motion to Dismiss*

¶ 64        Defendant also asserts that the trial court erred in denying his motion to dismiss the first-degree murder charge for insufficient evidence of premeditation and deliberation with specific intent to kill. We hold the trial court did not err based on the evidence when taken in the light most favorable to the State.

### a. *Standard of Review*

¶ 65        We review the denial of a motion to dismiss for insufficiency of the evidence *de*

*novo.  State v. Phachoumphone*, 257 N.C. App. 848, 861, 810 S.E.2d 748, 756 (2018).

Denial is proper when "there is substantial evidence (1) of each essential element of

the offense charged . . . , and (2) of defendant's being the perpetrator of such offense."

*State v. Scott*, 356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002).  Substantial evidence is

defined as "relevant evidence that a reasonable person might accept as adequate, or

would consider necessary to support a particular conclusion.  In this determination,

all evidence is considered in the light most favorable to the State, and the State

receives the benefit of every reasonable inference supported by that evidence."  *State*

*v. Hunt*, 365 N.C. 432, 436, 722 S.E.2d 484, 488 (2012).  Further, "[a]ny contradictions

or conflicts in the evidence are resolved in favor of the State, and evidence

unfavorable to the State is not considered."  *State v. Miller*, 363 N.C. 96, 98, 678

S.E.2d 592, 594 (2009) (citations omitted).

> ### b.  *Evidence of Premeditation and Deliberation*

¶ 66          Premeditation and deliberation are necessary elements of first-degree murder.

N.C. Gen. Stat. § 14-17(a) (2019).  Our Supreme Court has defined premeditation and

deliberation as follows:

> Premeditation means that the act was thought out
> beforehand for some length of time, however short, but no
> particular amount of time is necessary for the mental
> process of premeditation; it is sufficient if the process of
> premeditation occurred at any point prior to the killing.
> Deliberation means an intent to kill carried out in a cool
> state of blood, in furtherance of a fixed design for revenge

> or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation.
>
> An unlawful killing is deliberate and premeditated if done as part of a fixed design to kill, notwithstanding the fact that the defendant was angry or emotional at the time, unless such anger or emotion was strong enough to disturb the defendant's ability to reason.

*State v. Hunt*, 330 N.C. 425, 427, 410 S.E.2d 478, 480 (1991) (citations omitted).

¶ 67        Circumstantial evidence showing premeditation and deliberation includes, but is not limited to, the following:

> (1) want of provocation on the part of the deceased, (2) conduct and statements of the defendant before and after the killing, (3) threats made against the victim by the defendant, ill will or previous difficulty between the parties, and (4) evidence that the killing was done in a brutal manner.

*State v. Bullard*, 312 N.C. 129, 161, 322 S.E.2d 370, 388 (1984) (citation omitted). Other circumstantial evidence may include "the use of grossly excessive force, or the dealing of lethal blows after the deceased has been felled." *State v. DeGregory*, 285 N.C. 122, 129, 203 S.E.2d 794, 800 (1974) (citations omitted). Also pertinent is "any unseemly conduct towards the corpse of the person slain, or any indignity offered it by the slayer, as well as concealment of the body." *State v. Sokolowski*, 351 N.C. 137, 145, 552 S.E.2d 65, 70 (1999) (citation omitted).

¶ 68        Defendant argues that the State's circumstantial evidence in this case was

insufficient to allow a reasonable inference that he acted with premeditation and deliberation in killing Ms. Tucker, contending that: (1) the killing was not particularly "brutal" as the term is used in the first-degree murder context; and (2) the Defendant's disposal and concealment of the body was more indicative of Defendant's mindset after the killing than before it.

¶ 69   Relevant caselaw on whether a killing was brutal and thus indicative of premeditation and deliberation does not support Defendant's position.  For example, in *State v. Hager*, 320 N.C. 77, 83, 357 S.E.2d 615, 618 (1987), our Supreme Court held that a murder was completed in a brutal manner when the victim "died as a result of the defendant's vicious beating of him about the head with the butt of a rifle with such force as to cause an intracranial hemorrhage."  The medical examiner in this case testified that Ms. Tucker died from four lacerations to her skull and internal epidural hemorrhaging from repeated blunt force trauma.  Ms. Tucker also suffered even more grievous wounds, including: (1) hemorrhaging in her neck from strangulation or blunt force;[8] and (2) four broken ribs caused by blunt force trauma

---

[8] While the evidence was inconclusive as to whether the neck hemorrhage was caused by strangulation or blunt force trauma, we note that "[t]he jury may infer premeditation and deliberation from the circumstances of a killing, *including that death was by strangulation*." *State v. Richardson*, 328 N.C. 505, 513, 402 S.E.2d 401, 406 (1991) (citations omitted) (emphasis added).  Thus, the injury to Ms. Tucker's neck suggests premeditation and deliberation, whether it was inflicted by strangulation or blows beyond those to her ribs and skull.

inflicted at the time of death. While Defendant points to cases involving even more extreme attacks than those shown here to argue that this case did not include a brutal killing, the incidence of more barbaric murders does nothing to diminish the viciousness of Ms. Tucker's murder.

¶ 70 We are similarly unconvinced by Defendant's contention that the manner and method of the disposal of Ms. Tucker's body does not show premeditation. Our caselaw is replete with holdings that postmortem mistreatment and concealment of a body may support a reasonable inference of premeditation and deliberation. *See, e.g.*, *State v. Pridgen*, 313 N.C. 80, 94, 326 S.E.2d 618, 627 (1985) (holding evidence that "[t]he body was concealed at the side of a deserted dirt path" showed premeditation and deliberation); *State v. Rose*, 335 N.C. 301, 319, 439 S.E.2d 518, 527 (1994) (holding "evidence of an elaborate process of removing the body," including hiding and eventually burning the body, was "evidence from which a jury could infer premeditation and deliberation"), *abrogated on other grounds*, *State v. Buchanan*, 353 N.C. 332, 340, 543 S.E.2d 823, 828 (2001); *Sokolowski*, 351 N.C. at 149, 522 S.E.2d at 72 ("[T]his Court has held that unseemly conduct towards a victim's corpse and efforts to conceal the body are relevant as circumstantial evidence of premeditation and deliberation." (citing *Rose*, 335 N.C. at 318, 439 S.E.2d at 527); *State v. Parker*, 354 N.C. 268, 280–81, 553 S.E.2d 885, 895 (2001) (holding defendant's attempt to cover up the crime by mistreating and concealing the body in a car on a dirt road and

otherwise disposing of physical evidence was indicative of premeditation and deliberation); *State v. Dawkins*, 162 N.C. App. 231, 240, 590 S.E.2d 324, 331 (2004) (holding "evidence of an elaborate process of concealing the body by wrapping it in a towel, blanket, and trash bag; weighing the body down with weights and anchors; transporting the body to [a lake]; and disposing of the laden body to sink after the victim had been killed" was "evidence from which the jury could permissibly infer premeditation and deliberation").

In this case, the State introduced substantial evidence of: (1) undignified treatment and concealment of Ms. Tucker's body; and (2) efforts to destroy evidence of the murder. Police located Ms. Tucker's body in a shallow grave beneath a tree stump in the back corner of a rural field. The body had been stripped naked, arranged in a fetal position, and was bound with duct tape. Ms. Tucker's corpse was wrapped in three black trash bags before being transported to the grave and buried. The State introduced additional evidence suggesting Defendant sought to conceal his handling of the body by using chemical cleaners to wash the interior of his vehicle following Ms. Tucker's disappearance. We have no difficulty holding, based on our precedents, that the above conduct, coupled with the brutal nature of the killing, suffices to support a reasonable inference of premeditation and deliberation on the part of Defendant when viewed in the light most favorable to the State.

### 4. *Cumulative Prejudice*

In his final argument, Defendant asserts that all of the above errors, if insufficiently prejudicial standing alone, were so cumulatively prejudicial as to warrant a new trial. As discussed above, Defendant has failed to show any error by the trial court, and we hold that Defendant cannot show cumulative prejudice absent such error.

### III.       CONCLUSION

For the foregoing reasons, we hold Defendant received a fair trial, free from prejudicial error.

NO ERROR.

Judges TYSON and ARROWOOD concur.